STATE OF NORTH CAROLINA v. JAMES EDWARD WILLIAMS

No. 517A93

(Filed 13 June 1996)

**1. Jury § 219 (NCI4th)— capital murder—jury selection— juror unable to vote for death penalty—excusal for cause**

The trial court did not abuse its discretion during jury selection for a first-degree murder prosecution by excusing for cause a potential juror based upon her opinions about the death penalty

where the potential juror continually stated to the prosecutor and to the trial court that she did not believe that she could vote for the death penalty under any circumstances. The transcript supports the finding that she would be unable to perform her duties and unable to apply the law impartially in the case.

**Am Jur 2d, Jury §§ 199, 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**2. Jury § 256 (NCI4th)— capital murder—jury selection— peremptory challenges—racial motivation—findings**

There was no error in a first-degree murder prosecution in the trial court's ruling that defendant failed to make a *prima facie* showing of a *Batson* violation and in not making findings after the prosecutor gave reasons for his peremptory excusals where the court ruled that defendant had failed to make a *prima facie* showing before the prosecutor articulated his reasons for the peremptory challenges and only asked for the reasons after defendant requested that they be stated for the record. The ruling in *Hernandez v. New York*, 500 U.S. 352, requiring findings on whether the stated reasons are a pretext thus does not apply. The trial court did not err in finding that defendant failed to make a *prima facie* showing of discrimination because the fact that the prosecutor peremptorily excused two black jurors in a row and that every black juror to that point had been excused peremptorily or for cause is not enough by itself to mandate a *prima facie* showing. There is no evidence of this case being especially susceptible to racial discrimination since the defendant and the victim were both white and the excused jurors were black and the record supports the race-neutral reasons for excusal given by the prosecutor.

**Am Jur 2d, Jury § 244.**

**Use of peremptory challenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-Batson state cases. 20 ALR5th 398.**

**Use of peremptory callenges to exclude ethnic and racial groups, other than black Americans, from criminal jury—post-Batson federal cases. 110 ALR Fed. 690.**

**3. Criminal Law § 507 (NCI4th)— capital murder—ex parte contact between judge and jurors**

There was no prejudicial error in a first-degree murder prosecution where the court conducted *ex parte* interrogations of two seated jurors in chambers, conducted conferences with counsel in chambers out of the presence of defendant, and failed to reconstruct those interrogations and conferences in the presence of defendant. During the presentation of evidence in the guilt phase of the trial, two jurors indicated on separate occasions that they needed to raise an issue that might affect their ability to serve as a juror. On each occasion, the trial judge first conducted an *ex parte* examination of the juror in the presence of only the court reporter, the juror was excused from chambers after the trial judge's examination, and the trial judge continued the conference in chambers with the attorneys, but outside the sight and hearing of defendant, to report the substance of what the juror had said and to determine what should be done. One juror was acquainted with one of defendant's attorneys, and the other thought she might be related to the victim. Both continued to serve. Even if defendant had been present at the chambers conferences, he could not have compelled the trial judge to remove either juror, and the record does not reflect that the trial judge abused his discretion in not removing either juror.

**Am Jur 2d, Trial §§ 1573 et seq.**

**4. Homicide § 552 (NCI4th)— first-degree murder—refusal to instruct on second-degree**

The trial court did not err in a first-degree murder prosecution by refusing to instruct the jury on the lesser included offense of second-degree murder where, as to felony murder, the State presented positive evidence that defendant participated in the theft of the victim's car and personal property, there was no evidence that defendant did not participate in the transaction ending in the theft of the victim's car and personal property, and the fact that an accomplice participated hardly absolves defendant. As to premeditated and deliberate murder, the State presented evidence that defendant told an accomplice in advance that he knew a lady who had a car and that he could get it by killing her, there was no evidence presented that the accomplice struck the victim or inflicted the injuries, and defendant failed to present evidence of intoxication that rendered him utterly incapable of forming a deliberate and premeditated intent to kill. The evidence would

not have permitted the jury rationally to acquit defendant of felony murder and premeditated and deliberate murder and to find him guilty of second-degree murder.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

5. **Homicide § 668 (NCI4th)— capital murder—voluntary intoxication—refusal to instruct**

The trial court did not err in a first-degree murder prosecution by refusing to instruct the jury on voluntary intoxication. Although defendant contends that imposing on him a burden of production is a due process violation, the failure to meet the burden of production does not preclude defendant from introducing evidence on the issue and the jury may still consider the evidence. Here, defendant relied on evidence of the amount of alcohol consumed on the night of the murder and failed to meet the burden, the focus of which is the effect rather than the fact of intoxication. The evidence fails to show that at the time of the killing defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill.

**Am Jur 2d, Homicide § 517.**

**Modern status of the rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

**Effect of voluntary drug intoxication upon criminal responsibility. 73 ALR3d 98.**

6. **Evidence and Witnesses § 1422 (NCI4th)— capital murder—probation report—defendant's need for money—admissible**

The trial court did not err during a first-degree murder prosecution by allowing testimony that defendant knew he owed money as a condition of his probation and that a probation report was filed that stated that defendant was in default on his monthly payments. Although defendant argues that the testimony was not relevant because the probation violation report was not served on him until after the murder, the report was relevant to show that defendant was actually in default at the time of the murder and the jury could have reasonably inferred that defendant knew that

he was not making the required payments and needed money to make them in order to avoid a prison term.

**Am Jur 2d, Evidence §§ 304-312.**

7. **Criminal Law § 409 (NCI4th)— capital murder—sentencing closing arguments—final argument by both defense attorneys**

There was no error in a capital sentencing proceeding where defendant contended that the trial court refused to allow both of defendant's attorneys to argue during the final argument but the court's statement is at worst ambiguous and it is not clear whether the judge was referring to both of defendant's attorneys or to one when he said, "then you can argue." The law allows but does not require that more than one defense attorney address the jury during the defendant's final argument and the transcript cannot be interpreted to show that the court refused to permit both of defendant's attorneys to argue after the State where they never specifically requested to do so and never objected.

**Am Jur 2d, Trial §§ 544-546.**

8. **Criminal Law § 454 (NCI4th)— capital murder—prosecutor's argument—psychiatric report admitted as corroboration**

There was no gross impropriety in the prosecutor's argument in the sentencing phase of a capital murder prosecution where defendant claimed that the argument drew inferences from a psychiatric report, thereby using as substantive evidence a document that had been admitted only for corroborative purposes. The Rules of Evidence do not apply to sentencing proceedings and the argument consisted of reasonable inferences drawn from facts brought out in testimony that were relevant to the sentencing determination.

**Am Jur 2d, Trial §§ 572, 573.**

9. **Criminal Law § 454 (NCI4th)— capital murder—prosecutor's argument—pecuniary gain aggravating circumstance—probation report**

There was no gross impropriety in the prosecutor's argument in the sentencing phase of a capital murder prosecution where defendant contended that the prosecutor mischaracterized the pecuniary gain evidence relating to a probation violation report

by arguing that the report, which showed defendant's need for money, was served three days before the murder when it was filed three days before the murder but served after the murder. Even if the jury could have inferred from the statement that the probation violation report was served on defendant three days before the murder, defendant would not have been prejudiced. It has already been held that the fact that the report was filed three days before the murder was relevant because it showed that defendant was actually in jeopardy of returning to prison if he failed to make the payments and the jury could presume that defendant was aware of the terms of his probation.

**Am Jur 2d, Trial §§ 572, 573.**

**10. Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstances—no significant prior criminal history**

There was no error in the sentencing phase of a first-degree murder prosecution in the submission of the statutory mitigating circumstance of no significant history of prior criminal activity over defendant's objection. When viewed in light of the psychological and environment experiences of defendant, his prior criminal activity, mostly misdemeanor in character, could have been found by a reasonable juror to be insignificant in the determination of the sentencing recommendation in this case. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**11. Criminal Law §§ 682, 681 (NCI4th)— capital sentencing—peremptory instructions—mental or emotional disturbance—mental capacity**

The trial court did not err in the sentencing phase of a capital murder prosecution by refusing to instruct the jury peremptorily on the statutory mitigating circumstances that the murder was committed while defendant was under the influence of mental or emotional disturbance and that the capacity of defendant to appreciate the criminality of this conduct or to conform his conduct to the requirements of the law was impaired. The evidence supporting these two mitigating circumstances is controverted or not manifestly credible in that his evidence of alcohol impairment was controverted by evidence of his planning and attempting to conceal the murder, and evidence that he acted impulsively because of attention deficit disorder was controverted by psychi-

STATE v. WILLIAMS

[343 N.C. 345 (1996)]

atric evidence that defendant was responsible for his actions at the time of the crimes and knew right from wrong, testimony that defendant was able to conform his behavior to school requirements, testimony that attention deficit disorder becomes easier to manage as the individual grows older, and testimony that defendant did not act impulsively.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Comment Note.—Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

**12. Criminal Law § 1334 (NCI4th)— capital murder—theory of prosecution—aggravating circumstances—motion to require State to specify**

The trial court did not err in a capital murder prosecution by denying defendant's motions to require the State to specify the theory on which the State was prosecuting the charge of first-degree murder and the aggravating circumstances on which the State intended to rely in the penalty phase.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**13. Jury § 103 (NCI4th)— capital murder—individual voir dire**

There was no error in a capital murder prosecution in the trial court's denial of defendant's motions for individual *voir dire* of the potential jurors and of motions for individual *voir dire* of particular jurors concerning what they had heard or read about the case or their potential relationships to the victims.

**Am Jur 2d, Jury §§ 198, 199.**

**14. Jury § 141 (NCI4th)— capital murder—jury selection— parole eligibility**

The trial court did not err in a capital murder prosecution in denying defendant's motions to allow *voir dire* of potential jurors about their conceptions of parole eligibility or in not allowing defendant to argue that a life sentence would mean that defendant would serve life in prison.

**Am Jur 2d, Jury §§ 193 et seq.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**15. Criminal Law § 1330 (NCI4th)— capital murder—defendant's argument— life imprisonment if jury unable to agree**

There was no error in a capital murder prosecution in the trial court not allowing defendant to argue to the jury that the court was required by law to impose a sentence of life imprisonment if the jury was unable to unanimously agree on a verdict within a reasonable time.

Am Jur 2d, Criminal Law §§ 609 et seq.

**16. Constitutional Law § 371 (NCI4th)— first-degree murder— death penalty—not unconstitutional**

The North Carolina capital sentencing scheme is not unconstitutional on its face or as applied.

Am Jur 2d, Criminal Law § 628.

**17. Criminal Law § 1363 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—residual doubt—codefendant not receiving death penalty**

The trial court did not err in a capital sentencing proceeding by not submitting as nonstatutory mitigating circumstances that the evidence does not foreclose all doubt as to guilt or that a codefendant had confessed but will not be facing the death penalty.

Am Jur 2d, Criminal Law §§ 598 et seq.

**18. Criminal Law § 1327 (NCI4th)— capital sentencing— instructions—duty to recommend death**

The trial court did not err in a capital sentencing proceeding by instructing the jury that it had the duty to impose the death penalty if it found the mitigating circumstances failed to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty when considered with the mitigating circumstances.

Am Jur 2d, Trial §§ 1441 et seq.

**19. Criminal Law § 1343 (NCI4th)— capital sentencing—especially heinous, atrocious or cruel aggravating circumstance—not unconstitutional**

The aggravating circumstance in the capital sentencing proceeding that the murder was especially heinous, atrocious, or

cruel is not unconstitutionally vague and overbroad on its face and as defined by the charge to the jury.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**20. Criminal Law § 1348 (NCI4th)— capital sentencing— instructions—definition of mitigating circumstances**

The trial court did not err in a capital sentencing proceeding in using its definition of mitigating circumstances instead of that requested by defendant.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**21. Criminal Law § 1363 (NCI4th)— capital sentencing—non-statutory mitigating circumstances— instruction on proof and value**

The trial court did not err in a capital sentencing hearing in instructing the jury on the proof and mitigating value of non-statutory mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**22. Criminal Law § 1371 (NCI4th)— capital sentencing—pro-portionality review—not vague and arbitrary**

The standards set by the North Carolina Supreme Court for its proportionality review in capital cases are not vague and arbitrary and consistently have been narrowly defined and explained.

**Am Jur 2d, Criminal Law § 628.**

**23. Criminal Law § 1373 (NCI4th)— death sentence—not dis-proportionate**

A sentence of death for first-degree murder was not disproportionate where the record supports the submission and finding by the jury of the aggravating circumstances that the murder was committed for pecuniary gain and that the murder was especially heinous, atrocious, or cruel; despite defendant's argument to the contrary, the jury could have rationally found that defendant was not influenced by a mental or emotional disturbance at the time he committed the murder while finding that he suffered from "dependent avoidance disorder with self-defeating features"; and there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. In this case the jury found the aggravating circum-

stance that the murder was especially heinous, atrocious, or cruel and defendant was convicted on the theory of premeditation and deliberation. This case is more similar to cases in which the death sentence was proportionate than cases in which it was disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something monetary value, and the like-post-Gregg cases. 66 ALR4th 417.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing a sentence of death entered by Greeson, J., at the 11 October 1993 Criminal Session of Superior Court, Randolph County, upon a jury verdict of guilty of first-degree murder in a case in which defendant was tried capitally. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for common law robbery was allowed 20 December 1994. Heard in the Supreme Court 12 September 1995.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Ann B. Petersen for defendant-appellant.*

ORR, Justice.

The defendant, James Edward Williams, was found guilty of first-degree murder both on the basis of premeditation and deliberation and under the felony murder rule. He was also found guilty of common law robbery. After a capital sentencing hearing, the jury recommended a sentence of death for the first-degree murder conviction; Judge Greeson sentenced defendant accordingly and additionally sentenced defendant to a consecutive term of ten years' imprisonment on the robbery conviction.

The evidence tended to show that defendant and Bernice Sikes were "boyfriend-girlfriend." While Sikes was in prison in January of 1991, defendant told her by phone on several occasions that he knew a lady that had a car and that he could get it by killing her.

On 14 February 1991, defendant, Sikes, and defendant's cousin, Hammonds, who were all living at the Thomasville home of defendant's mother, left the house at about 5:00 p.m. to go bowling in High Point. They stayed at the bowling alley for about an hour, then rode around the area, stopping at an ABC store. Next, they stopped at a Burger King and then a game room, where defendant bought a six-pack of beer. The three played pool at the game room, returned to the bowling alley about 9:00 p.m., and left the bowling alley about 11:00 p.m. While Hammonds drove, defendant gave directions to the Trinity home of the victim, Elvie Rhodes. Hammonds dropped off defendant and Sikes at Rhodes' home. Defendant told Hammonds to tell his mother that somebody picked him up at the bowling alley.

Sikes testified that she and defendant waited outside the home of Elvie Rhodes while defendant finished his six-pack of beer. Defendant told her that they were at the house of a woman he had gone out to supper with several times. He then told Sikes to wait outside and entered the house. After a short interval, Sikes knocked on the door, which defendant opened wearing only his underpants. He later told Sikes he had undressed to keep from getting blood on his clothes. Sikes entered the house and saw Ms. Rhodes with a bloody face and eyes swollen shut. Defendant kicked and slapped Ms. Rhodes; rubbed his hand on the side of her face and licked the blood off; hit her in the head with a pole from a kitchen chair; and told her, "You know I'm going to kill you, don't you?" Next, defendant took Ms. Rhodes to the bathroom so that she could see her face, then he took her back to the living room and threw her to the floor. Defendant told Sikes to clean up the blood in the kitchen. He then said to Sikes, "She won't die, baby." Sikes further testified that she looked in the living room and saw defendant's arm around Ms. Rhodes' throat, choking her. Then defendant stomped Ms. Rhodes in the stomach, chest, and throat. He then gave Sikes his knife and told her to go cut the venetian blind cord. Defendant used the cord to choke Ms. Rhodes until she died.

Next, defendant instructed Sikes to clean up the blood and fingerprints and to look for money. Sikes then helped defendant wrap Ms. Rhodes' body in a quilt and put it in the trunk of Ms. Rhodes' car. They left in the car at around 6:00 or 6:30 a.m. and subsequently threw a bag containing poles from the kitchen chair and the cloth that the blood had been cleaned up with into a trash bin behind a car wash in Thomasville. They proceeded from there to Hardee's and bought breakfast. Later that day, they disposed of the body in some woods

near Farmer, where Sikes used to live. Ms. Rhodes' car was found parked and abandoned outside a restaurant in Thomasville. A latent palm print on the trunk was identified as defendant's.

When Sikes was first arrested, she told police that she committed the murder. At trial, she testified that she had falsely confessed to protect defendant because he told her she would get in less trouble than he would because she was a mother of three, while he had a bad prior record.

## JURY SELECTION

### I.

[1] Defendant contends that the trial court improperly excused for cause potential juror Vernell Honeycutt based on her opinions about the death penalty. We disagree.

> The test for determining whether a prospective juror may be properly excused for cause for his views on the death penalty is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). . . .

> We have recognized that a prospective juror's bias may not always be "provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

*State v. Green*, 336 N.C. 142, 158-59, 443 S.E.2d 14, 24 (citation omitted), *cert. denied*, — U.S. —, 130 L. Ed. 2d 547 (1994). The trial court's ruling will not be disturbed absent abuse of discretion. *Id.*

Defendant claims that potential juror Honeycutt should not have been excused for cause because she said that she would be willing to follow the law and the evidence. However, a review of the entire *voir dire* transcript supports a finding that Honeycutt's views against the death penalty would prevent or substantially impair the performance of her duties as a juror. "[A] potential juror's equivocation on the subject of the death penalty may stem from a 'conscientious desire to do his duty as a juror and to follow the court's instructions in the face of recognizing his personal inability to impose the death penalty.' " *State*

*v. Miller,* 339 N.C. 663, 679, 455 S.E.2d 137, 145 (quoting *State v. Yelverton,* 334 N.C. 532, 544, 434 S.E.2d 183, 190 (1993), *cert. denied,* — U.S. —, 133 L. Ed. 2d 169 (1995). Here, Honeycutt continually stated to the prosecutor and to the trial court that she did not believe that she could vote for the death penalty under any circumstances. When the court asked if she knew of any circumstances that she could think of when she could vote to impose the death penalty, Honeycutt replied, "No, I don't know of any." The trial court properly could have concluded that Honeycutt's statement that she would follow the court's instructions arose out of her desire to perform her duties as a juror according to the dictates of the law. The *voir dire* transcript supports the trial court's finding that Honeycutt would be unable to perform her duties and unable to apply the law impartially in the case. The court's excusal for cause of potential juror Honeycutt was not an abuse of discretion. This assignment of error is overruled.

## II.

[2] Defendant next contends that during jury selection, the State exercised its peremptory challenges to remove black jurors on the basis of race in violation of *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69 (1986). We hold that no error occurred involving the State's use of peremptory challenges in jury selection.

Defendant assigns error to the peremptory challenges of two of the five black jurors who were in the venire. The other three were removed for cause. Defendant objected to the peremptory challenges during jury selection. The trial court ruled that defendant had not made a *prima facie* case, but agreed to defendant's request that the prosecutor give his reasons for excusing the jurors for the record. The prosecutor stated as his reasons for peremptorily challenging the first juror that

> [s]he had a brother that was charged with assault in Virginia with a shotgun, and also she had a sister that was murdered. She also has [sic] her niece is seeing a psychiatrist, and she related that, and also she wasn't particularly paying any attention to what was going on and her demeanor is not—She also was having trouble whether to judge somebody or not. She has a problem in that she could not judge anybody now but she was hesitant, in my opinion, and also on the death penalty, in my judgment.

The prosecutor stated as his reasons for excusing the second juror

her demeanor and her answers to me. Also she had had—She knew Ms. Hole and she also knew Ms. Hedrick from a court case in court in which she and an officer had a—she tore up a ticket and threw it in the officer's face. We were aware of that, and she had a relationship with Ms. Hole that was not—was unlike her answers to me and I do not feel that her answers, her attitude was such that she was definitely not—just did not feel comfortable with her answers and her demeanor. And she lied about knowing Ms. Hedrick. . . . And she has a significant traffic record.

Defendant argues that the court erred both in not making findings after the prosecutor gave his reasons for excusing the jurors and in not finding that a *Batson* violation occurred.

As summarized in *State v. Jackson*, 322 N.C. 251, 368 S.E.2d 838 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989), the Supreme Court held that in *Batson v. Kentucky*

a prima facie case of purposeful discrimination in the selection of a petit jury may be established on evidence concerning the prosecutor's exercise of peremptory challenges at the trial. In order to establish such a prima facie case the defendant must be a member of a cognizable racial group and he must show the prosecutor has used peremptory challenges to remove from the jury members of the defendant's race. The trial court must consider this fact as well as all relevant circumstances in determining whether a prima facie case of discrimination has been created. When the trial court determines that a prima facie case has been made, the prosecution must articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group. The prosecutor's explanation need not rise to the level of justifying a challenge for cause. At this point the trial court must determine if the defendant has established purposeful discrimination. Since the trial court's findings will depend on credibility, a reviewing court should give those findings great deference. *Batson*, 476 U.S. [at] 98, n.21, 90 L. Ed. 2d [at] 89, n.21.

*State v. Jackson*, 322 N.C. at 254-55, 368 S.E.2d at 840. In *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411 (1991), the Supreme Court held that a defendant has standing to complain that a prosecutor used the State's peremptory challenges in a racially discriminatory manner by excusing jurors of a different race than the defendant. Thus, the fact

**STATE v. WILLIAMS**

[343 N.C. 345 (1996)]

that defendant was white did not preclude him from making a *prima facie* showing of discrimination in the exclusion of black jurors.

Defendant's argument that the trial court was required to make findings after the prosecutor gave his reasons for excusing the jurors in question is based on the rule established in *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395 (1991), and applied in *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied,* — U.S. —, 130 L. Ed. 2d 650 (1995). If the prosecutor volunteers his reasons for the peremptory challenges in question before the trial court rules whether the defendant has made a *prima facie* showing or if the trial court requires the prosecutor to give his reasons without ruling on the question of a *prima facie* showing, the question of whether the defendant has made a *prima facie* showing becomes moot, and it becomes the responsibility of the trial court to make appropriate findings on whether the stated reasons are a credible, nondiscriminatory basis for the challenges or simply pretext. *Hernandez v. New York*, 500 U.S. at 359, 114 L. Ed. 2d at 405; *State v. Robinson*, 336 N.C. at 93, 443 S.E.2d at 312.

That rule does not apply in this case because the trial court made a ruling that defendant failed to make a *prima facie* showing before the prosecutor articulated his reasons for the peremptory challenges. The court only asked for the reasons after defendant requested them to be stated for the record. The trial judge stated, "the Court holds that there hasn't been a prima facia [sic] showing that he's purposefully discriminated at all on the basis of the Court's hearing of the answers and especially the demeanor of the last one. But go ahead, for the record." Thus, our review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing.

Defendant based his objection solely on the fact that the prosecutor peremptorily excused two black jurors in a row, which, when combined with the for-cause excusals, resulted in every black juror up to that point having been excused. The trial court based its finding on the answers and demeanor of the peremptorily excused jurors. Because the trial court considers all relevant circumstances including the demeanor and questions and answers of both the prosecutor and the excused jurors, we must give the court's judgment deference. *See Batson v. Kentucky*, 476 U.S. at 98, 90 L. Ed. 2d at 89.

After reviewing the transcript and the parties' arguments, we find nothing to indicate that the court erred. The fact that the prosecutor peremptorily excused two black jurors in a row and that, when com-

bined with three for-cause removals, every black juror to that point had been excused is not enough by itself to mandate a *prima facie* showing. *See State v. Smith*, 328 N.C. 99, 121, 400 S.E.2d 712, 724 (1991) ("the acceptance rate of minorities by the State is relevant to our inquiry, but it is not dispositive"). There is no evidence of this case being especially susceptible to racial discrimination since the defendant and the victim were both white and the excused jurors were black. *See State v. Porter*, 326 N.C. 489, 391 S.E.2d 144 (1990) (the trial court should consider the susceptibility of the particular case to racial discrimination). Furthermore, the record supports the race-neutral reasons for excusal given by the prosecutor. Therefore, we hold that the trial court committed no error in finding that defendant failed to make a *prima facie* showing of a *Batson* violation and in not making findings after the prosecutor gave reasons for his peremptory excusals.

## GUILT-INNOCENCE PHASE

### III.

[3] Defendant next contends that the trial judge erred by conducting *ex parte* interrogations of two seated jurors in chambers and conferences with counsel in chambers, out of the presence of defendant, and by failing to reconstruct those interrogations and conferences in the presence of defendant. Defendant claims these actions violated his right to be present at every stage of his trial, as guaranteed by Article I, Section 23 of the Constitution of North Carolina and the Sixth Amendment to the Constitution of the United States. *See, e.g., State v. Payne*, 320 N.C. 138, 357 S.E.2d 612 (1987). We agree, but hold that the error was harmless beyond a reasonable doubt.

On two occasions during the presentation of evidence during the guilt-innocence phase of the trial, a separate juror seated in the regular jury of twelve indicated to the trial judge by message through a bailiff that he or she needed to raise an issue that might affect his or her ability to serve as a juror. One juror was acquainted with one of defendant's attorneys, and the other thought she might be related to the victim. On each occasion, the trial judge first conducted an *ex parte* examination of the juror in the presence of only the court reporter, outside the presence of counsel and of defendant. On each occasion, the juror was excused from chambers after the trial judge's examination, and the trial judge continued the conference in chambers with the attorneys, but outside the sight and hearing of defendant, to report the substance of what the juror had said and to deter-

mine what, if anything, should be done. On each occasion, the trial continued after the chambers conference with the juror involved continuing to serve as a member of the jury.

We have held that the trial court errs when it communicates with a juror in the absence of the defendant. *See State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *State v. Payne*, 320 N.C. 138, 357 S.E.2d 612. We have also held that the trial court errs when it conducts a chambers conference with counsel for the state and counsel for defendant in defendant's absence. *See State v. Daniels*, 337 N.C. 243, 259, 446 S.E.2d 298, 309 (1994), *cert. denied*, — U.S. —, 130 L. Ed. 2d 895 (1995); *State v. Brogden*, 329 N.C. 534, 541-42, 407 S.E.2d 158, 163 (1991).

> If the defendant's absence from a proceeding constitutes error, a new trial is required unless the State demonstrates the error was harmless beyond a reasonable doubt. A record of what occurred at the proceeding may show the harmlessness of the error.

*State v. Daniels*, 337 N.C. at 257, 446 S.E.2d at 307 (citation omitted).

In this case, all chambers communications complained of were recorded by the court reporter at the time they occurred. After reviewing these transcripts and the arguments of the parties, we conclude that the error was harmless beyond a reasonable doubt.

Defendant claims that if he had been present at the conferences, he could have prompted removal of the two jurors in question. However,

> "[t]he trial judge has broad discretion in supervising the selection of the jury to the end that both the state and the defendant may receive a fair trial. This discretionary power to regulate the composition of the jury continues beyond empanelment. It is within the trial court's discretion to excuse a juror and substitute an alternate at any time before final submission of the case to the jury panel. These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error."

*State v. McLaughlin*, 323 N.C. 68, 101, 372 S.E.2d 49, 70 (1988) (quoting *State v. Nelson*, 298 N.C. 573, 593, 260 S.E.2d 629, 644 (1979), *cert. denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980), *sentence vacated*

*on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990) (citations omitted).

Thus, defendant could not have forced the removal of either juror. The decision was always in the discretion of the trial judge. The record reflects that the trial judge thoroughly interviewed the juror who was a friend of the defense attorney and determined that he would still be able to perform his duties as a juror. The record also reflects that the trial judge determined that the juror who thought she might be distantly related to the victim was not disqualified by N.C.G.S. § 15A-1212(5) because the possible relationship was beyond the sixth degree. All four conferences were recorded, and defense counsel were given an opportunity, in defendant's presence, to be heard regarding each juror. The record does not reflect any abuse of discretion by the trial judge in his decision not to remove either juror.

Thus, even if defendant had been present at the chambers conferences, he could not have compelled the trial judge to remove either juror, and the record does not reflect that the trial judge abused his discretion in not removing either juror. Therefore, any error committed by the trial court in conducting conferences with jurors and counsel outside the presence of defendant was harmless beyond a reasonable doubt.

## IV.

[4] Defendant next assigns error to the trial court's refusal to instruct the jury on the lesser-included offense of second-degree murder. We hold that the trial court did not err in refusing to give this instruction.

We recently discussed this issue in *State v. Conaway,* 339 N.C. 487, 453 S.E.2d 824, *cert. denied,* — U.S. —, 133 L. Ed. 2d 153 (1995):

The test for determining whether the jury must be instructed on second-degree murder is whether there is any evidence in the record which would support a verdict of second-degree murder. *State v. Strickland,* 307 N.C. 274, 285, 298 S.E.2d 645, 653 (1983), *overruled in part on other grounds by State v. Johnson,* 317 N.C. 193, 344 S.E.2d 775 (1986). " 'It is unquestioned that the trial judge must instruct the jury as to a lesser-included offense of the crime charged, when there is evidence from which the jury could find that the defendant committed the lesser offense.' " *State v. Conner,* 335 N.C. 618, 635, 440 S.E.2d 826, 835 (1994) (quoting *State v. Redfern,* 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976),

*overruled in part on other grounds by State v. Collins,* 334 N.C. 54, 431 S.E.2d 188 (1993)). However, if the State's evidence is sufficient to satisfy its burden of proving each element of first-degree murder, including premeditation and deliberation, and there is not evidence other than defendant's denial that he committed the crime to negate these elements, the trial court should not instruct the jury on second-degree murder. *Id.* at 634-35, 440 S.E.2d at 835 (citing *State v. Strickland,* 307 N.C. at 293, 298 S.E.2d at 658).

The United States Supreme Court has indicated that in cases where one or more elements of the offense charged remain in doubt but the defendant is clearly guilty of some offense, the jury is likely to resolve its doubts in favor of a conviction rather than to acquit the defendant altogether. *Beck v. Alabama,* 447 U.S. 625, 634, 65 L. Ed. 2d 392, 401 (1980). In such cases, an instruction on a lesser-included offense must be given to reduce the risk of an unwarranted conviction. *Id.* at 635, 65 L. Ed. 2d at 401. However, due process requires an instruction on a lesser-included offense only "if the evidence would permit the jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Id.*

*State v. Conaway,* 339 N.C. at 514, 453 N.C. at 841.

In this case, the question is whether the evidence would have permitted the jury rationally to find defendant guilty of second-degree murder and to acquit him of both felony murder and premeditated and deliberate murder.

As to felony murder, defendant argues that the jury could have found that Bernice Sikes stole the items of personal property from inside the house without his knowledge or direct participation. However, the State presented positive evidence that defendant participated in the theft of Ms. Rhodes' car and personal property. Sikes testified that defendant searched Ms. Rhodes' purse and freezer for money and knew Sikes stole Ms. Rhodes' pocketbook, a flashlight, and a radio, and that together they loaded Ms. Rhodes' body into the trunk and drove away in the car. Also a latent palm print lifted from the trunk of the car and submitted to the State Bureau of Investigation for analysis was determined to have been made by the left palm of defendant. There was no evidence that defendant did not participate in the transaction ending in the theft of Ms. Rhodes' car and personal property. The fact that Bernice Sikes also participated in the commission of this felony hardly absolves defendant. Thus, the

evidence would not have permitted the jury rationally to acquit defendant of felony murder.

Furthermore, as to premeditated and deliberate murder, defendant offers two interpretations of the evidence which he claims would have permitted the jury rationally to find him guilty of second-degree murder and acquit him of premeditated and deliberate murder. First, defendant suggests that Sikes argued with Ms. Rhodes and killed her, as she originally told police, and that defendant, extremely intoxicated from the large quantity of alcohol he consumed that night, tried to stop Sikes when the fight started, was unable to do so, assisted in the crime of second-degree murder committed by Sikes, and helped her dispose of the body. Second, defendant suggests that he committed the murder with his mind so befuddled by alcohol that he was utterly incapable of forming a deliberate and premeditated intent to kill.

The State presented positive evidence of premeditation and deliberation by defendant. Sikes testified that defendant told her in advance that "he knew a lady that had a car and that he could get it by killing her." She also testified that defendant told Ms. Rhodes that he was going to kill her before he did so. Although two defense witnesses testified that Sikes had told them she would kill a woman who caused her and defendant to separate, no evidence was presented that Sikes struck the victim or inflicted the injuries. Defendant also failed to present evidence of intoxication that rendered him utterly incapable of forming a deliberate and premeditated intent to kill. The evidence showed that defendant was not too intoxicated to give detailed directions to the witness who drove defendant and Sikes to Ms. Rhodes' home, to take steps to conceal his presence at the scene of the murder, and to conceal or dispose of incriminating evidence. Thus, the evidence would not have permitted the jury rationally to acquit defendant of premeditated and deliberate murder and to find him guilty of second-degree murder.

For the foregoing reasons, the trial court did not commit error in refusing to instruct the jury on the lesser-included offense of second-degree murder.

## V.

[5] Defendant also assigns error to the trial court's refusal to instruct the jury on voluntary intoxication. We hold that the trial court committed no error by refusing to give this instruction.

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

> The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987) [(citations omitted)] (quoting *State v. Medley*, 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)).

*State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988).

Defendant claims that it is a due process violation to impose on him a burden of production to entitle him to a voluntary intoxication instruction because such a burden is inconsistent with the State's burden of proving to the jury guilt beyond a reasonable doubt. As we noted in *State v. Phipps*, 331 N.C. 427, 456-57, 418 S.E.2d 178, 194 (1992), the failure to meet the burden of production does not preclude defendant from introducing evidence on the issue. When the burden of production is not met, and an instruction on involuntary intoxication is therefore not given, the jury may still consider the evidence of intoxication in deciding whether the State has proved premeditation and deliberation beyond a reasonable doubt. Thus, the State's burden of proving guilt beyond a reasonable doubt is unchanged, and there is no due process violation.

In this case, defendant failed to meet the burden of production necessary to entitle him to an instruction on voluntary intoxication and was therefore not entitled to the instruction. Defendant relies on evidence of the amount of alcohol he consumed on the night of the murder. However, the focus of the inquiry is not the fact of intoxication, but its effect. "If by reason of voluntary intoxication a defendant

did not form a specific intent to kill after premeditation and deliberation, an essential element of first-degree murder is absent and the offense is reduced to second-degree murder." *State v. Harvell*, 334 N.C. 356, 367, 432 S.E.2d 125, 131 (1993).

Although the evidence of the amount of alcohol consumed by the 235-pound defendant is disputed, the evidence as to the effect of intoxication does not show that defendant was incapable of forming the requisite intent. As discussed above, the evidence shows that defendant was able to give detailed directions to the witness who drove defendant and Sikes to the victim's house. According to Sikes' testimony, defendant was able to take steps to conceal his presence at the scene of the murder by taking off his shirt to keep from getting blood on it and by instructing Sikes to wipe down the doorknobs, thermostat control, and radio. According to Sikes' testimony, defendant was able to conceal or dispose of incriminating evidence by wrapping the victim's body in a quilt and taking the body and other evidence of the crime to be disposed of elsewhere, throwing some of the objects that had been used in the crime into a trash bin behind a car wash in Thomasville.

This evidence fails to show that at the time of the killing defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. Thus, we conclude that defendant failed to meet his burden of production, and the trial court committed no error in refusing to give an instruction on voluntary intoxication.

## CAPITAL SENTENCING PROCEEDING

### VI.

[6] Defendant contends that the trial court erred during the sentencing proceeding by allowing testimony that defendant knew he owed money as a condition of his probation and that a probation violation report was filed that stated that defendant was in default on his monthly payments. Defendant claims that this testimony was not relevant as evidence that the murder was committed for pecuniary gain because the probation violation report informing him that he was in default was not served on him until after the murder occurred. We disagree.

"Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case." *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989). The testimony revealed that

the payment of restitution was a condition of the suspension of a ten-year sentence the defendant had received and that defendant was in default on his monthly payments to the court when the probation violation report was filed on 11 February 1991, prior to the 14 February 1991 murder. Thus, the report was relevant to show that defendant was actually in default at the time of the murder. This testimony tended to support the finding of the pecuniary gain aggravating circumstance because the jury could have reasonably inferred that defendant knew that he was not making the required payments and needed money to make them in order to avoid a prison term. This assignment of error is overruled.

## VII.

**[7]** Defendant contends that the trial court refused to allow both of defendant's attorneys to argue during the last or final argument of closing arguments in the sentencing phase, thereby committing reversible error. We disagree.

In *State v. Eury*, 317 N.C. 511, 346 S.E.2d 447 (1986), we held that the trial court committed prejudicial error in refusing to permit both counsel for defendant to address the jury during defendant's closing argument at the guilt-innocence phase of the trial. Relying on *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986), we stated that when the defendant is entitled to the final argument to the jury in a capital case,

> his attorneys may each address the jury as many times as they desire during the closing phase of the argument. The only limit to this right is the provision of N.C.G.S. § 84-14 allowing the trial judge to limit to three the number of counsel on each side who may address the jury.

*State v. Eury*, 317 N.C. at 516-17, 346 S.E.2d at 450. N.C.G.S. § 15A-2000(a)(4) gives the defendant or defendant's counsel the right to the last argument in a capital sentencing proceeding.

In *State v. Simpson*, 320 N.C. 313, 357 S.E.2d 332 (1987), *cert. denied*, 485 U.S. 963, 99 L. Ed. 2d 430 (1988), the trial court ruled that it would "allow the defendant to have an opening argument by one attorney and the District Attorney to have one argument and the defendant to have the closing argument by one attorney." *Id.* at 326-27, 357 S.E.2d at 339. We held that the trial court's refusal to permit both counsel for the defendant to address the jury during the defendant's statutorily guaranteed final argument in the sentencing phase of

his capital case "deprived the defendant of a substantial right and amounted to prejudicial error." *Id.* at 327, 357 S.E.2d at 340.

In *State v. Mitchell,* 321 N.C. 650, 365 S.E.2d 554 (1988), the trial court ruled that only one counsel for the defendant could address the jury during the defendant's final argument in the sentencing phase. We resolved the issue as follows:

In *Eury* it was unnecessary to decide whether such error was prejudicial per se, because on the specific facts before us we concluded that "one can only speculate as to how the jury would have reacted had defendant not been deprived of her substantial right to have both counsel make closing argument." [*State v. Eury,*] 317 N.C. at 517, 346 S.E.2d at 450. We now conclude that these concerns expressed in *Eury* are common to all cases in which defendants are deprived of their right to have all of their counsel address the jury during each argument that they are entitled to make at the conclusion of either phase of a capital case. Therefore, we hold that the trial court's refusal to permit both counsel to address the jury during the defendant's final arguments constituted prejudicial error per se in both the guilt-innocence and sentencing phases.

*State v. Mitchell,* 321 N.C. at 659, 365 S.E.2d at 559.

The case at bar, however, is distinguishable. In each of the cases cited above, we held that the court erred by refusing to permit more than one defense attorney to argue last, thereby actively depriving defendant of a substantial right. In *Eury,* the defendant's counsel moved and argued that both defense counsel be permitted to address the jury during defendant's closing argument and objected to and noted exception to the court's ruling that only one could argue after the State. *State v. Eury,* 317 N.C. at 513-14, 346 S.E.2d at 448-49. In *Simpson,* the trial court made a ruling that it would allow "the defendant to have the closing argument by one attorney." *State v. Simpson,* 320 N.C. at 327, 357 S.E.2d at 339. In *Mitchell,* the defendant requested that both of his counsel be allowed to address the jury during the final argument, and the trial court ruled that only one counsel for the defendant could speak during defendant's final argument. *State v. Mitchell,* 321 N.C. at 657, 365 S.E.2d at 558.

In the case at bar, after defendant's counsel had informed the trial court that both attorneys for the defendant planned to make a closing argument to the jury and other matters were discussed, the

court asked who was going to argue first. The transcript reads as follows:

> MR. OLDHAM [Defendant's counsel]: I believe the State.
>
> THE COURT: No, sir. They just have closing. You have—
>
> MR. BUNCH [Defendant's counsel]: I'll be arguing first.
>
> THE COURT: And then the State will argue and then you can argue.

This final statement by the court is, at worst, ambiguous. It is unclear whether the judge was referring to both of defendant's attorneys or to Mr. Oldham alone when he said, "then you can argue." The court may have intended for Mr. Bunch to argue, then the State, then both defense attorneys if they should choose to do so. The transcript contains no specific reference to or request that both defense attorneys argue after the State, and defendant's attorneys never objected to the fact that both of them did not argue after the State.

The law does not require that more than one defense attorney address the jury during the defendant's final argument; it simply allows such a practice. We cannot interpret the transcript to show that the court refused to permit both of defendant's attorneys to argue after the State where they never specifically requested to do so and never objected. For the foregoing reasons, this assignment of error is overruled.

## VIII.

[8] Defendant next claims the prosecutor's argument was improper in two respects. We disagree. Since defendant failed to object, he must demonstrate that the prosecutor's arguments amounted to gross impropriety. *E.g., State v. Rouse,* 339 N.C. 59, 91, 451 S.E.2d 543, 560 (1994), *cert. denied,* — U.S. —, 133 L. Ed. 2d 60 (1995). In making this inquiry, it must be stressed that prosecutors are given wide latitude in their argument. *Id.* Counsel have wide latitude to argue the law, the facts, and reasonable inferences supported thereby. *E.g., State v. Frye,* 341 N.C. 470, 498, 461 S.E.2d 664, 678 (1995), *cert. denied,* — U.S. —, 134 L. Ed. 2d 526 (1996).

Defendant claims that the prosecutor's argument drew inferences from a psychiatric report from Dorothea Dix Hospital, thereby using as substantive evidence a document that had been admitted only for impeachment purposes. However, the Rules of Evidence do not apply

in sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992); *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, — U.S. —, 133 L. Ed. 2d 739 (1996). Therefore, the prosecutor may properly have argued reasonable inferences based on the report.

The psychiatric report was the result of a court-ordered forensic screening and determination of defendant's competency to stand trial. The report was used as part of the basis of the expert opinion testimony of Drs. Hoover and Badawi, which defendant presented during the penalty phase of the trial. The State used the report in its cross-examination of defendant's expert witnesses. Because the report was used in the penalty phase, the Rules of Evidence do not apply, and the State was properly allowed to argue reasonable inferences drawn from the testimony concerning the report. A review of the transcript reveals that the prosecutor's argument consisted of reasonable inferences drawn from facts brought out in testimony that were relevant to the sentencing determination. This assignment of error is overruled.

[9] Defendant also claims that the prosecutor's argument was grossly improper because it mischaracterized the pecuniary gain evidence relating to defendant's probation violation report by arguing that the probation violation report, showing defendant's need for money to avoid going to prison, was served on him three days before the murder. The report was filed three days before the murder but was not served on defendant before the murder.

The prosecutor stated, "That's why on February 14th, 1991[,] three days after this probation violation was served on him or three days after it was filed we find him at the Rhodes' house looking for money." Even if the jury could have inferred from this statement that the probation violation report was served on defendant three days before the murder, the defendant would not have been prejudiced. We have already held that the fact that the report was filed three days before the murder was relevant because it showed that defendant was actually in jeopardy of returning to prison if he failed to make the late payments, and the jury could presume that defendant was aware of the terms of his probation. We fail to find that the argument was grossly improper. This assignment of error is overruled.

## IX.

[10] Defendant also contends that the trial court erred in submitting to the jury, over defendant's objection, the N.C.G.S. § 15A-2000(f)(1)

statutory mitigating circumstance that defendant had no significant history of prior criminal activity. Defendant concedes that a trial court has the duty to submit a statutory mitigating circumstance when there is evidence at the trial from which a reasonable juror could find that the circumstance exists even when the defendant objects. *See State v. Lloyd*, 321 N.C. 301, 312, 364 S.E.2d 316, 323, *sentence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). However, defendant argues that no rational juror could find that defendant's criminal history was insignificant. We note that

> " '[s]ignificant' means that the activity is likely to have influence or effect upon the determination by the jury of its recommended sentence. . . . In other words, the prior criminal activity could be found by the jury to be completely irrelevant to the issue of sentencing. The prior activity of the defendant could be found by the jury to be completely unworthy of consideration in arriving at its decision. There could be evidence of prior criminal activity in one case that would have no influence or effect on the jury's verdict, which, in another case, could be the pivotal evidence."

*State v. Artis*, 325 N.C. at 314-15, 384 S.E.2d at 490 (quoting *State v. Wilson*, 322 N.C. 117, 147, 367 S.E.2d 589, 609 (1988) (Martin, J., concurring)) (alteration in original).

Thus, the focus should be placed on whether the criminal history is such as to influence the jury's sentencing recommendation. A very limited record might be significant in the jury's consideration, while a lengthy criminal record might be insignificant.

> *See, e.g., Wilson*, 322 N.C. 117, 367 S.E.2d 589 (error not to submit mitigating circumstance where prior criminal activity in evidence was felony conviction for kidnapping of defendant's former wife when defendant was twenty years old and involvement in theft and drugs); *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (two twenty-year-old felonies properly submitted under N.C.G.S. § 15A-2000(f)(1)); *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. [1164], 90 L. Ed. 2d 733 (1986) (submission of this mitigating circumstance to the jury proper, notwithstanding a record showing eighteen felony convictions, all acquired during defendant's youth), *overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

*State v. Artis*, 325 N.C. at 314-15, 384 S.E.2d at 490-91. The trial court must consider all relevant circumstances and determine whether a

rational jury could conclude that defendant had no significant history of prior criminal activity as it relates to the sentencing decision. If the court so decides and the mitigating circumstance is submitted to the jury, the jury must decide whether the evidence is sufficient to constitute a significant history of criminal activity and thus preclude a finding of that circumstance. *Id.*

Here, defendant presented evidence tending to show that he became involved in crime through a combination of psychological influences, including anxiety over separation from his father and modeling his behavior on his father's behavior. After this testimony was presented, the trial court correctly noted that the court must submit the (f)(1) mitigating circumstance if it determined that a rational juror could conclude that the defendant had no significant history of prior criminal activity, and whether the evidence is sufficient to constitute significant criminal activity is for the jury to decide. The court then informed the attorneys that it intended to submit the (f)(1) mitigating circumstance over defendant's objection. Next, the court properly allowed the State to rebut defendant's evidence by exposing defendant's prior criminal record.

In its charge to the jury, the court stated, "You should not determine whether [defendant's prior criminal history] is significant only on the basis of a number of convictions, if any, in the defendant's record. Rather, you should consider the nature and the quality of the defendant's history . . . ." The court then instructed the jury that

> you would find this mitigating circumstance if you find that the defendant's record consists of being convicted of misdemeanor larceny, misdemeanor breaking or entering, and misdemeanor larceny, two counts; misdemeanor possession of stolen property, carrying a concealed weapon—misdemeanor, misdemeanor [breaking and entering], and possession of a weapon of mass destruction, uttering forged papers, misdemeanor assault on a female, and misdemeanor assault with a deadly weapon, and that this is not a significant history of prior criminal activity.

When viewed in light of the psychological and environmental experiences of defendant, this prior criminal activity, mostly misdemeanor in character, could have been found by a reasonable juror to be insignificant in the determination of his or her sentencing recommendation in this case. Therefore, the trial court did not err in submitting the N.C.G.S. § 15A-2000(f)(1) statutory mitigating circumstance to the jury.

## X.

[11] Defendant contends that the trial court erred in refusing to instruct the jury peremptorily on two statutory mitigating circumstances: N.C.G.S. § 15A-2000(f)(2), that the murder was committed while the defendant was under the influence of mental or emotional disturbance, and N.C.G.S. § 15A-2000(f)(6), that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. We disagree.

If requested, a trial court should give a peremptory instruction for any statutory or nonstatutory mitigating circumstance that is supported by uncontroverted and manifestly credible evidence. *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, — U.S. —, 133 L. Ed. 2d 879 (1996). If the evidence supporting the circumstance is controverted or is not manifestly credible, the trial court should not give the peremptory instruction. *Id.* The trial court's refusal to give the peremptory instruction does not prevent defendant from presenting, or the jury from considering, any evidence in support of the mitigating circumstance.

After reviewing the record and transcripts, we conclude that the evidence supporting the two mitigating circumstances in question is controverted or is not manifestly credible. Defendant claims the mitigating circumstances were supported by evidence that he acted impulsively because of his alcohol impairment and because he suffered from attention deficit disorder. Defendant's evidence of alcohol impairment was controverted by evidence of his actions of planning and attempting to conceal the murder, as discussed in issue V above. Defendant's evidence that he acted impulsively because he suffered from attention deficit disorder was also controverted. Dr. Hoover testified that in a psychiatric report from Dorothea Dix Hospital, Dr. Lynn found that defendant was responsible for his actions at the time of the alleged crime and knew right from wrong. Dr. Badawi testified that defendant was able to conform his behavior to the school requirement and that attention deficit disorder gets easier to manage as the individual grows older. Bernice Sikes' testimony tended to show that defendant did not act impulsively. This assignment of error is overruled.

## XI.

Defendant also identifies several preservation issues, which he acknowledges this Court has previously decided adversely to his

position. We decline to overturn our prior holdings on these issues, and we find that defendant has not shown that the trial court committed prejudicial error in any of these issues, but the issues are preserved for later review by the United States Supreme Court or a lower federal court. The preservation issues and controlling case law follow.

[12] 1. Did the court err in denying defendant's motions to require the State to specify the theory on which the State was prosecuting the charge of first-degree murder and the aggravating circumstances on which the State intended to rely in the penalty phase? Held no error in *State v. Williams*, 339 N.C. 1, 452 S.E.2d 245 (1994), *cert. denied,* — U.S. —, 133 L. Ed. 2d 61 (1995); *State v. Baker*, 338 N.C. 526, 451 S.E.2d 574 (1994); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied,* 502 U.S. 902, 116 L. Ed. 2d 232 (1991).

[13] 2. Was the trial court's denial of defendant's motions for individual *voir dire* of the potential jurors and of motions for individual *voir dire* of particular jurors concerning what they had heard or read about the case or their potential relationships to the victim error? Held no error in *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied,* — U.S. —, 130 L.Ed.2d 895 (1995); *State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979).

[14] 3. Did the court err in denying defendant's motions to allow *voir dire* of potential jurors about their conceptions of parole eligibility or in not allowing defendant to argue to the jury that a life sentence would mean that defendant would serve life in prison? "[A] criminal defendant's status under the parole laws is irrelevant to a sentencing determination, and, as such, cannot be considered by the jury during sentencing . . . ." *State v. Robbins*, 319 N.C. 465, 518, 356 S.E.2d 279, 310, *cert. denied,* 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

[15] 4. Did the court err by not allowing defendant to argue to the jury that the court was required by law to impose a sentence of life imprisonment if the jury was unable to unanimously agree on a verdict within a reasonable time? "[I]t is improper for the jury to consider .what may or may not happen in the event it cannot reach a unanimous sentencing verdict." *State v. Smith*, 305 N.C. 691, 710, 292 S.E.2d 264, 276, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982).

[16] 5. Is the North Carolina capital sentencing scheme, on its face or as applied, unconstitutional? North Carolina's capital sentencing scheme has consistently been held constitutional. *E.g., State v.*

STATE v. WILLIAMS

[343 N.C. 345 (1996)]

*Williams,* 339 N.C. 1, 452 S.E.2d 245; *State v. Roper,* 328 N.C. 337, 402 S.E.2d 600.

**[17]** 6. Did the court err in refusing to submit as nonstatutory mitigating circumstances (a) that "defendant has been found guilty beyond a reasonable doubt of first degree murder, but the evidence does not foreclose all doubt as to his guilt"; and (b) that a "co-defendant, Bernice Sikes, has confessed to committing the crime but will not be facing the death penalty"? Held no error in *State v. Ward,* 338 N.C. 64, 449 S.E.2d 709 (1994), *cert. denied,* — U.S. —, 131 L. Ed. 2d 1013 (1995); *State v. Williams,* 305 N.C. 656, 292 S.E.2d 243, *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982).

**[18]** 7. Did the court err in instructing the jury that it had the duty to impose the death penalty if it found the mitigating circumstances failed to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty when considered with the mitigating circumstances? Defendant's argument has been repeatedly rejected. *E.g., State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252; *State v. McDougall,* 308 N.C. 1, 301 S.E.2d 308, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 173 (1983).

**[19]** 8. Is the aggravating circumstance that the murder was especially heinous, atrocious, or cruel unconstitutionally vague and overbroad on its face and as defined by the charge to the jury? Held constitutional in *State v. Williams,* 339 N.C. 1, 452 S.E.2d 245.

**[20]** 9. Did the court err in using its definition of mitigating circumstances instead of that requested by defendant? The instruction given by the court was substantially similar to that upheld in *State v. Conaway,* 339 N.C. 487, 453 S.E.2d 824.

**[21]** 10. Did the trial court err in instructing the jury on the proof and mitigating value of nonstatutory mitigating circumstances? This argument was rejected in *State v. Hill,* 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied,* 507 U.S. 924, 122 L. Ed. 2d 684 (1993).

**[22]** 11. Are the standards set by the North Carolina Supreme Court for its proportionality review vague and arbitrary? This Court's procedure in conducting proportionality review is not vague and arbitrary and consistently has been narrowly defined and explained. *E.g., State v. Bacon,* 337 N.C. 66, 446 S.E.2d 542 (1994), *cert. denied,* — U.S. —, 130 L. Ed. 2d 1083 (1995); *State v. Roper,* 328 N.C. 337, 402 S.E.2d 600.

## PROPORTIONALITY REVIEW

## XII.

[23] We now turn to the duties reserved by N.C.G.S. § 15A-2000(d)(2) exclusively for this Court in capital cases. Two aggravating circumstances, N.C.G.S. § 15A-2000(e)(6), that the murder was committed for pecuniary gain, and N.C.G.S. § 15A-2000(e)(9), that the murder was especially heinous, atrocious, or cruel, were submitted to the jury without objection. The record supports the submission and finding by the jury of these two aggravating circumstances.

Defendant argues that the fact that the jury answered "no" to the statutory mitigating circumstance that defendant was under the influence of a mental or emotional disturbance and answered "yes" to the nonstatutory mitigating circumstance that defendant suffered from "dependent avoidance disorder with self- defeating features" shows that the jury was influenced by passion, prejudice, or other arbitrary consideration. However, the jury could have rationally found that defendant was not influenced by a mental or emotional disturbance at the time he committed the murder, while finding that he suffered from "dependent avoidance disorder with self-defeating features." Therefore, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We must now turn to our final statutory duty of proportionality review.

Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *accord* N.C.G.S. § 15A-2000(d)(2) (Supp. 1995). We do not conclude that the imposition of the death penalty in this case is aberrant or capricious.

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144 (1993), *cert. denied*, — U.S. —, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the

cases in which we have found the death penalty to be proportionate. *Id.* Although we review all of these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

Defendant argues that this case is more compelling for a life sentence than either *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), or *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987). We disagree. In *Young*, the two aggravating circumstances found were pecuniary gain and committed in the commission of a robbery. In finding the death sentence disproportionate, this Court focused on the fact that there was no finding that defendant was engaged in a course of conduct including other violent crimes or that the murder was especially heinous, atrocious, or cruel. The present case is distinguishable from *Young* because, among other things, in this case the jury found the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

This case is also distinguishable from *State v. Stokes*, in which the defendant was convicted by the jury solely under the theory of felony murder. Here, defendant was convicted on the theory of premeditation and deliberation as well as under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

After reviewing the cases, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment. Therefore, the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

Having considered and rejected all of defendant's assignments of error, we hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. Comparing this case to similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. Therefore, the sentence of death entered against defendant must be and is left undisturbed.

NO ERROR.