STATE OF NORTH CAROLINA v. SHELTON DARREL MILLS

No. COA12-855

Filed 5 March 2013

**1. Jury—selection—prima facie case of discrimination—Batson hearing**

The trial court did not err in a murder case by failing to conduct a *Batson* hearing where defendant failed to establish a *prima facie* case of discrimination.

**2. Evidence—hearsay—statements made by deceased—then existing mental condition—admissible**

The trial court did not err in a murder case by admitting alleged hearsay statements one of the deceased victims had made to her sister-in-law. The statements were admissible to show the victim's then existing mental, emotional, or physical condition pursuant to N.C.G.S. § 8C-1, Rule 803(3). Furthermore, defendant did not make any argument concerning how the alleged error prejudiced him.

**3. Appeal and Error—preservation of issues—no prejudice**

Defendant failed to preserve for appellate review the argument that the trial court erred in a murder case by failing to instruct the jury on the potential interest of one of the witnesses who was testifying under the hope of a sentence reduction. Even assuming, arguendo, that defendant had properly preserved this argument, the evidence of defendant's guilt was overwhelming and defendant could not demonstrate prejudice.

Appeal by Defendant from judgments entered 31 May 2011 by Judge Alma L. Hinton in Superior Court, Pitt County. Heard in the Court of Appeals 28 January 2013.

*Attorney General Roy Cooper, by Special Deputy Attorney General Richard L. Harrison, for the State.*

*Brock, Payne & Meece, P.A., by C. Scott Holmes, for Defendant.*

McGEE, Judge.

Shelton Darrel Mills (Defendant) had been in a relationship with Cylvonnia Preddy Crowder (Crowder) that soured. According to the trial testimony of Crowder's sister-in-law, Ursula Preddy (Preddy), Defendant became jealous and harassed Crowder. Crowder told Preddy she had ended her relationship with Defendant, but that he continued "harassing her and calling her and coming past her house and coming to the job." Crowder began a relationship with Robert Bizzell (Bizzell). Crowder told Preddy that Defendant was still bothering her, and that she needed to change her phone number. Defendant had threatened to "get her." Crowder told Preddy she was scared of Defendant.

A 911 call was received at 1:09 a.m. on 26 August 2007 from Crowder's residence. When the Pitt County Sheriff's Office responded,

Crowder was found dead on the floor of her home with a phone next to her. She had been shot in the head and chest, and there was "blood all over the place." Blood was found throughout the house, including in the bathroom sink and the bathtub. Bizzell's body was found by a gate in the yard. He had gunshot wounds in his chest and abdomen.

At the time of the shootings, Tantelane Moseley (Moseley) was in a relationship with Defendant. At around 12:50 a.m. on 26 August 2007, Defendant asked to borrow Moseley's car to go to the convenience store and he returned between 1:20 and 1:30 a.m. Moseley testified to the following:

> [When Defendant returned], he was all, you know, like he had been in a altercation. He was nervous and was, you know, upset, you know, like he was running from something or whatever.
>
> Q. Had you seen him like that before?
>
> A. No. No. I haven't.
>
> Q. And then what happened?
>
> A. And I asked him what was wrong, and he was like he got to leave. He need to leave. And he asked me would I, you know, take him out of town. I was like no, because my children here, and I—you know, my kids was in the room asleep, so—and he like pulled me by arm and we left. We left, and he was driving my car, and—
>
> Q. And do you recall what he was wearing at that point?
>
> A. He had on the gold shirt, still a gold shirt and some— his jeans and—and his [Timberland] boots.
>
> Q. Okay. I'm sorry to interrupt you. And then what happened after he grabbed you by the arm?
>
> A. Okay. And so he was—I was like—What happened? What's wrong?
>
> He was like—he was—I asked him what took him so long. At first I asked him what took him so long getting back from the store, and he was like he went across the creek.

I was like—Why you go across the creek? And he was like he went to—there to, you know, be with his cousins or whatever, and—and he said while he was over there he got into a argument with a guy, and they was fighting and he had shot him in the leg.

Agent Elliot Smith (Agent Smith) of the State Bureau of Investigation (SBI) was assigned as the lead investigator. After speaking with relatives of Crowder and Bizzell, Agent Smith became interested in interviewing Defendant. Defendant agreed to meet Agent Smith and supervising SBI Agent John C. Rea (Agent Rea) at the Winterville Police Department. Defendant then rode with Agent Rea to the SBI office in Greenville. During the drive to Greenville, Defendant told Agent Rea that he had checked with the magistrate's office and the sheriff's office to see if any warrants had been taken out on him. Agent Rea noticed what looked like "blood spatter" on Defendant's jeans. Defendant asked Agent Rea if he (Defendant) was going to die. Agent Rea asked Defendant if he was referring to the death penalty, and Defendant answered that he was. Defendant asked Agent Rea if he could guarantee that Defendant would not get the death penalty, and Agent Rea said he could not guarantee that. Defendant was crying throughout this conversation.

Agents Rea and Smith interviewed Defendant at the SBI office the morning of the shootings. According to Agent Rea, Defendant first stated that he wanted the agents to know that he "thought a lot of her [Crowder]." According to Agent Rea,

> [Defendant] indicated that he'd gone to [Crowder's] house. He wanted to see her. He went to the door, and he referred to Mr. Bizzell as the boyfriend. Said the boyfriend came to the door. He told the boyfriend or Mr. Bizzell that he wanted to speak to [Crowder].
>
> [Defendant] said that the boyfriend said—she's in the shower. I'll go and get her. [Defendant] said that the boyfriend left the front door. He stepped inside the house.

Q. Who?

A. [Defendant] stepped inside the house. [Crowder] came out of the bathroom with a towel wrapped around her, and [Defendant] then said the boyfriend kept pushing up behind her, kept pushing up behind her, and then he said—I can't talk about it anymore.

He then—the other thing he said, he told me—says he's not trying to be hard to get along with. He just had a lot of things going through his mind at that time.

Defendant stopped talking about the events of that morning, and Agents Rea and Smith arrested Defendant and charged him with the murders. Agent Smith collected the clothes Defendant was then wearing, which included a pair of blue jeans, a black t-shirt, and a pair of Timberland boots.

Defendant was detained in the Pitt County Detention Center. A fellow detainee, John Newkirk (Newkirk), testified at trial. Newkirk stated he had played cards with Defendant daily, and that Defendant had told him that he had killed his girlfriend and the guy with whom she was "messing around[.]"

Defendant's jeans were sent to the SBI crime lab for DNA testing. Results showed that some of the blood on Defendant's jeans came from Crowder, and some of the blood came from Bizzell.

Defendant's evidence consisted of the testimony of two of Defendant's family members and a psychiatrist, all of whom testified that Defendant was mentally impaired and incapable of fully functioning in society. Defendant's evidence appeared to be mainly directed at challenging the State's argument that the murders were first-degree, based upon premeditation and deliberation. As part of the closing argument, one of Defendant's attorneys told the jury:

Shelton Mills is mentally retarded. He's intellectually impaired, and he's seriously mentally ill. His mental problems impair him in basic ways that have profound effects on his ability to function in his daily life. He's affected cognitively and volitionally. He's not normal like most of us are.

We're here today because of Shelton's mental, intellectual, social, and functional retardations and mental disorder. We've told you consistently in this trial one thing, really, that Shelton Mills is not guilty of first-degree murder. If you boil it down, that's what we've been saying. And you say it different ways in [c]ourt, but you know, in [c]ourt there are ways you can say things, and there are ways you are supposed to say things, and you have to go at it—use certain words at certain times

and—but that's what it boils down to. We're saying he's not guilty of first-degree murder.

And that in no way diminishes the loss of the people here. We're not here valuing lives. That's what happens in civil court sometimes. We wish we could turn back the hands of time and make it so any of this happened [sic], but no one of us have that power, and it's not in any way to diminish any loss here. There's severe loss.

The jury found Defendant guilty on two counts of first-degree murder, based upon malice, premeditation and deliberation and felony murder. The jury found Defendant guilty of first-degree burglary, and used that conviction as the underlying felony for felony murder. Defendant was also convicted of possession of a firearm by a felon. Defendant was sentenced to two consecutive life terms without the possibility of parole plus 117 to 150 months. Defendant appeals.

I.

Defendant's arguments on appeal are whether: (1) the trial court failed to hold a *Batson* hearing after Defendant established a *prima facie* case of discrimination, (2) the trial court erroneously admitted hearsay statements and, (3) the trial court erroneously failed to instruct the jury on the potential interest one of the State's witnesses had in providing testimony favorable to the State.

II.

**[1]** In Defendant's first argument, he contends the trial court erred by failing to conduct a *Batson* hearing after he had established a *prima facie* case of discrimination. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the Constitution of North Carolina forbid the use of peremptory challenges for a racially discriminatory purpose. *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986). In *Batson*, the United States Supreme Court set out a three-part test to determine whether a prosecutor impermissibly used peremptory challenges to excuse prospective jurors on the basis of race, and we have adopted this test[.] First, the defendant must make a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race. If such a showing is made, the prosecutor

is required to offer a facially valid and race-neutral rationale for the peremptory challenge or challenges. Finally, the trial court must decide whether the defendant has proven purposeful discrimination.

*State v. Barden*, 356 N.C. 316, 342, 572 S.E.2d 108, 126 (2002) (citations omitted).

"Where the trial court rules that a defendant has failed to make a *prima facie* showing, our review is limited to whether the trial court erred in finding that defendant failed to make a *prima facie* showing, even if the State offers reasons for its exercise of the peremptory challenges."

*Barden*, 356 N.C. at 343, 572 S.E.2d at 127 (citations omitted).

"Since the trial judge's findings . . . largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Our appellate courts accord great deference in reviewing the trial court's ruling on the establishment of a *prima facie* case. The trial court's ultimate *Batson* decision "will be upheld unless the appellate court is convinced that the trial court's determination is clearly erroneous."

To review defendant's claim that the trial court erred in ruling that he had failed to establish a *prima facie* case of intentional discrimination, we consider the following factors:

"[(1)] whether the 'prosecutor used a disproportionate number of peremptory challenges to strike African-American jurors in a single case;' [(2)] whether the defendant is a 'member of a cognizable racial minority;' . . . [(3)] whether the state's challenges appear to have been motivated by racial discrimination; . . . [(4)] 'the victim's race[;] [(5)] the race of the State's key witnesses[;]' and [(6)] 'whether the prosecutor made racially motivated statements or asked racially motivated questions of black prospective jurors . . . that raise[d] an inference of discrimination.' "

*State v. Mays*, 154 N.C. App. 572, 576, 573 S.E.2d 202, 205 (2002) (citations omitted). "Because the trial court considers all relevant circumstances including the demeanor and questions and answers of both the prosecutor and the excused jurors, we must give the court's judgment deference." *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 387 (1996) (citation omitted).

Defendant contends that, at the time of his objection, the State had accepted one African American juror and used peremptory challenges to exclude three, while it had accepted sixteen white jurors and used peremptory challenges to exclude four. Defendant is correct that, at the time Defendant objected, the State's acceptance rate, excluding jurors dismissed for cause, was twenty-five percent for African American potential jurors, and eighty percent for white potential jurors. While numerical analysis of the peremptory challenges used may be useful in the *Batson* analysis, it is not dispositive. *Barden*, 356 N.C. at 344, 572 S.E.2d at 127. In the present case, Defendant does not argue that any other factors supporting a *prima facie* case of intentional discrimination were present, and our review of the record reveals none. In the present case, perhaps most importantly, Defendant and both Crowder and Bizzell were African American. In addition, the State questioned all the prospective jurors in the same manner, and there were no racially motivated comments made or questions asked during jury selection, and the responses of the prospective jurors provided reasonable justification for exclusion. *Mays*, 154 N.C. App. at 576, 573 S.E.2d at 205; *Williams*, 343 N.C. at 359, 471 S.E.2d at 387.

Three prospective African American jurors were peremptorily excused by the State prior to Defendant's objection. The first stated that he had had unpleasant encounters with law enforcement, and he had reservations about the death penalty because of its "misapplication." The second stated that he might lose his driver's license due to a DWI and would have trouble making it to court. The third stated that serving would be a hardship because she would miss work and would not get paid.

We stress there is no bright-line rule with respect to the percentage of prospective jurors of a particular race or class that are accepted or the percentage excluded through peremptory challenges. We must consider all the relevant factors. *Mays*, 154 N.C. App. at 576, 573 S.E.2d at 205. In the present case, after considering all the relevant factors, we are not convinced that the trial court's determination was clearly erroneous. *Id.* This argument is without merit.

## III.

[1] In Defendant's second argument, he contends the trial court erred by admitting hearsay statements Crowder made to Preddy. We disagree.

The State sought to introduce the contested testimony pursuant to, *inter alia*, Rule 803(3) of the North Carolina Rules of Evidence:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> **Then Existing Mental, Emotional, or Physical Condition.**—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]

N.C. Gen. Stat. § 8C-1, Rule 803 (2011). " 'Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand.' " *State v. Bishop*, 346 N.C. 365, 379, 488 S.E.2d 769, 776 (1997) (citation omitted).

> "The victim's state of mind is relevant if it bears directly on the victim's relationship with the defendant at the time the victim was killed." Moreover, we have also stated that "a victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant."

*State v. King*, 353 N.C. 457, 477, 546 S.E.2d 575, 591 (2001) (citations omitted). " 'Accordingly, the statements [concerning the relationship between the victim and defendant] are admissible not as a recitation of facts but to show the victim's state of mind.' " *State v. Hernandez*, 202 N.C. App. 359, 362, 688 S.E.2d 522, 524 (2010) (citation omitted).

The contested testimony of Preddy involved the relationship between Defendant and Crowder, and statements by Crowder that Defendant was harassing her and had threatened her. Defendant makes the conclusory statement that "[t]he statements of . . . Crowder to [Preddy] all constituted statements of memory to prove a fact remembered and is [sic] thus not within North Carolina

Rule of Evidence 803(3)." In his brief, Defendant does not argue why we should find this to be true, nor does Defendant cite to any authority supporting this conclusory statement. Having reviewed the law and the facts of this argument, we hold that the trial court did not err in admitting Preddy's testimony pursuant to Rule 803(3).

Furthermore, Defendant does not make any argument concerning how any alleged error prejudiced him. Defendant erroneously states that it is the State's burden to prove any error was harmless beyond a reasonable doubt. It is true that Defendant's trial counsel made an objection at trial based upon constitutional grounds—Defendant's sixth amendment right to confront witnesses against him. An objection on constitutional grounds is, in itself, insufficient. Defendant must show on appeal that one of Defendant's constitutional rights has been abridged.

However, on appeal, Defendant admits that Crowder's statements to Preddy were not testimonial, and were "not controlled by *Crawford v. Washington*." Defendant has made no compelling argument that his constitutional right to confront witnesses against him was denied. This Court has recently stated:

> "Evidence tending to show a declarant's state of mind is an exception to the hearsay rule. . . . . [T]he failure of a trial court to admit or exclude this evidence will not result in the granting of a new trial absent a showing by defendant that a reasonable possibility exists that a different result would have been reached absent the error."

*Hernandez*, 202 N.C. App. at 362-63, 688 S.E.2d at 524-25 (citations omitted).

Even assuming, *arguendo*, Preddy's testimony was admitted in error, Defendant has failed in his burden of showing that a reasonable probability existed that, absent this evidence, a different result would have been reached at trial. Defendant's trial strategy did not appear to be forcibly contesting that Defendant committed the murders. Defendant's trial strategy appeared to be directed at showing that Defendant was mentally impaired and thus incapable of premeditation and deliberation. Further, Defendant does not challenge his conviction for first-degree burglary, and Defendant was also convicted on two counts of first-degree murder pursuant to the felony murder rule. This argument is without merit.

STATE v. MILLS

[225 N.C. App. 773 (2013)]

IV.

**[3]** In Defendant's final argument, he contends that the trial court erred by failing "to instruct the jury on the potential interest of [Newkirk,] who was testifying under the hope of a sentence reduction[.]" We disagree.

Defendant has not preserved this argument for appellate review. Defendant argues that, during the course of the trial, he requested an instruction concerning potential interest Newkirk might have had in the outcome of the trial. Specifically, Defendant states that Newkirk was testifying for the State "under the hope of a reduction of federal sentence." Defendant contends the trial court refused to give the requested instruction during Newkirk's testimony, but indicated that it would give the instruction at the close of the trial. The trial court never gave the requested instruction during the charge conference, and Defendant neither requested it again, nor objected to its omission.

Initially, Defendant does not include any part of Newkirk's testimony in his brief and, therefore, has not, and cannot, make any argument as to how this testimony, absent the requested instruction, might have prejudiced him. It is not the job of this Court to make Defendant's argument for him.

In addition, though Defendant includes the standard of review for plain error in the first part of his argument, Defendant never contends that the trial court committed plain error, nor does Defendant request that we review this alleged error for plain error. "In criminal cases, an issue that was not preserved by objection noted at trial . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4). This argument has been abandoned. N.C.R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

Even assuming, *arguendo*, that Defendant had properly preserved this argument at trial and on appeal, the evidence that Defendant shot Crowder and Bizzell, even absent Newkirk's testimony, is overwhelming. Defendant cannot demonstrate prejudice.

No error.

Chief Judge MARTIN and Judge CALABRIA concur.