IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-719

Filed 06 June 2023

Buncombe County, No. 17 CRS 87031

STATE OF NORTH CAROLINA

v.

DAVON SMITH

Appeal by defendant from judgment entered 24 June 2021 by Judge Forrest D. Bridges in Buncombe County Superior Court. Heard in the Court of Appeals 22 February 2023.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Sonya Calloway-Durham for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender David W. Andrews, for defendant-appellant.*

ARROWOOD, Judge.

Davon Smith ("defendant") appeals from judgment entered upon his conviction for first-degree murder. Defendant contents the trial court erred by: (1) failing to instruct the jury on second-degree murder; (2) failing to instruct the jury on intent, premeditation, and deliberation for adolescents; (3) admitting a video interview and identification of a witness; (4) admitting an identification of another witness because investigators were improperly suggestive during the interview; and (5) permitting

officers to testify the witnesses were forthcoming when they identified defendant because that invaded the province of the jury. Defendant further contends that the "cumulative prejudice" of these alleged errors entitles him to a new trial. For the following reasons, we hold the trial court did not err.

## I.    Background

At 12:15 p.m. on 25 June 2017, Asheville Police Department ("APD") was dispatched to a shooting at the Pisgah View Apartments. Upon arrival, law enforcement located a victim "on the ground behind" one of the apartment buildings. The victim was "in a large pool of blood" and surrounded by a crowd of people, some of whom were attempting to render aid. The victim was transported by EMS to the hospital but was later pronounced deceased.

The victim was identified as Rondy Samuel Shields, III ("Mr. Shields"), also known as "ManMan[.]" An autopsy revealed Mr. Shields was shot once, and the bullet "entered on the right side of [his] back . . . then exited . . . through the front of [his] neck." His cause of death was determined to be a gunshot wound to the back. Although five shell casings from a 40-caliber Smith & Wesson firearm were recovered from the scene, the casings produced no identifiable latent prints.

As part of the investigation, law enforcement also obtained a video of the shooting from one of the cameras at the apartment complex. The video showed two apartment complexes separated by a street, with a parked gold sedan in the lower right portion of the screen. At the beginning of the video, Mr. Shields can be seen in

the distance walking up the street towards the camera. While Mr. Shields is walking, a woman in a pink shirt walks up to the gold sedan, and two vehicles drive by, a silver vehicle followed by a dark colored sedan. Although the silver vehicle leaves the view of the camera, the black sedan stops abruptly and then backs up. Then, as a person in a black hoodie comes into view in the bottom right-hand corner of the video, a female in a red shirt emerges from the back passenger side of the gold sedan.

When Mr. Shields sees the person in the black hoodie, he pauses, takes a few steps back, then starts running away behind the apartment complex. Although the woman in the red shirt approaches the person in the black hoodie and attempts to stop them, the person in the hoodie runs a few steps while shooting in the direction of Mr. Shields. A woman in a blue shirt emerges from the driver's seat of the gold sedan and the other woman from the vehicle begin to run away. As most are running away, another person in a white shirt, dark-colored jacket, and shorts emerges from the bottom right corner of the screen and runs towards the shooter. Then, the shooter and the person in the shorts both run out of frame in the same direction. From the video, law enforcement identified potential witnesses, and a suspect vehicle which they believed to be the vehicle defendant exited before the shooting occurred.

One potential witness identified from the video was Samantha Pulliam ("Ms. Pulliam"). Ms. Pulliam went to APD the afternoon of the shooting for an interview with Detective Jonathan Morgan ("Detective Morgan") and Detective Tracy Crowe ("Detective Crowe"). During the interview, Ms. Pulliam wrote out a statement and

looked at photographs of potential suspects, ultimately identifying defendant as the

shooter. Ms. Pulliam's written statement read:

> I was sittin [sic] in Pisgah View pickin [sic] up my
> granddaughter [and her] mother Mellasia. A silver car
> pulled up the shooter "Bop" got out click [sic] the gun I
> grabbed his arm tried to stop him and he just kept shootin
> [sic] even after (ManMan) was [on] the ground then he got
> back in the car and left with 2 guys an [sic] possibly a
> female.

Furthermore, Ms. Pulliam identified Mahogany Fair ("Ms. Fair"), also known as

"Hog," as someone who was on scene and picked her out of a photo lineup. That

evening, Detective Morgan obtained a warrant for defendant's arrest for the first-

degree murder of Mr. Shields. At the time of the shooting, defendant had just turned

sixteen.

The next day, 26 June 2017, a silver Chevrolet Impala, believed to be the

suspect vehicle from the surveillance video, was located at a different apartment

complex. Pursuant to a search warrant, the vehicle was searched "for possible touch

DNA[,]" processed for latent fingerprints, and trace taped. Although the fingerprints

from the vehicle were not of "useful quality[,]" they were entered into the automated

fingerprint identification system. The prints produced no potential suspects.

On 27 June 2017, Detectives Morgan and Crowe interviewed Mellasia Skyes

("Ms. Skyes"), someone Ms. Pulliam identified as being a witness to the shooting.

Although Ms. Skyes initially denied knowing the shooter, she eventually admitted

defendant, also known as "Bop," was her cousin, and identified him as the shooter in

a lineup. Ms. Skyes stated in her recorded interview that Mr. Shields and defendant were arguing over Latrina or Trina ("Trina"), defendant's fourteen-year-old sister who allegedly had sex with Mr. Shields. Ms. Skyes further stated she had calmed defendant down earlier that day, but Ms. Fair was encouraging him to harm Mr. Shields. Ms. Skyes said that during the shooting and when defendant got out of the car, she heard someone yelling at defendant not to "let it slide."

Although law enforcement attempted to locate defendant for several months, they were unsuccessful until November. On 8 November 2017, U.S. Marshals, who were assisting in the search for defendant, got information that defendant was at a Motel 6 off Tunnel Road in room 123. Motel 6 records showed the room was rented 6 November to a Chad Case. Defendant was located inside the motel room, in the bathroom. The lights in the bathroom were off and defendant was "in the bathtub against the corner." Thereafter, on 4 December 2017, a Buncombe County grand jury indicted defendant for first-degree murder and possession of a handgun by a minor.

The matter came on for trial in the Buncombe County Superior Court on 7 June 2021, Judge Bridges presiding. The State did not proceed with the possession of a handgun by a minor charge, so the only matter for trial was the first-degree murder charge.

As an initial matter, the trial court addressed defendant's pre-trial motions. Defendant filed a motion in limine, requesting an order prohibiting the State "from calling witnesses, including but not limited to [Ms. Pulliam] and [Ms. Skyes], to

testify[,]" arguing there was "substantial likelihood the witnesses w[ould] deny or contradict their prior statements to law enforcement[.]" Defendant further requested the State be prohibited "from asking Ms. Pulliam questions about . . . defendant being the shooter[,]" or alternatively a *voir dire* of witnesses.

In court, defendant's attorney stated that he and his investigator spoke with Ms. Pulliam, and she told them she could not identify defendant and he was concerned the witness would contradict their prior statement and the State would impeach her with the prior statement. Defense counsel said that if the State was on notice of the contradiction, admission of the prior statement would be improper. The court denied the *voir dire* request, but found the State was "on notice" and "may be bound by what [Ms. Pulliam] says."

The court also addressed defendant's motion to suppress pretrial and in-court identification evidence. In this motion, defendant argued the lineup identification by Ms. Pulliam should be suppressed due to violations of the Eyewitness Identification Reform Act ("the Act"), Ms. Skyes's lineup identification should be suppressed for due process concerns, and both witnesses should not be allowed to do in-court identifications. Specifically, as to Ms. Pulliam, defendant argued the fact that Ms. Pulliam was not alone during the photo lineup, and her boyfriend was allowed to stay in the room with her, was a "substantial violation" of the Act, requiring suppression of both the lineup and any in-court identification. Both of defendant's pre-trial motions were denied.

Before the trial began, the State requested a show cause order and an arrest warrant for Ms. Pulliam, who was subpoenaed to be in court to testify but "failed to appear pursuant to the subpoena." Later that day, Ms. Pulliam was located, taken into custody, and brought to the courthouse to testify.

Ms. Pulliam testified that on 25 June 2017, she was with Ms. Skyes, who she identified as the woman in the video wearing the red shirt, and Ms. Skyes's friends Nadia and Trina at the Pisgah View Apartments. Ms. Pulliam testified that she got "a glimpse" of the shooter's face and that she had "seen him previously in the" apartment complex. Although Ms. Pulliam stated she "didn't know" defendant, she was familiar with who he was "in passing" and recognized him as "Bop." Ms. Pulliam further testified that she did go to APD on the day of the shooting, but only because law enforcement "told [her] that [she] was on camera and that [she] had no choice." **[T4 485]** Ms. Pulliam's statement from her interview was admitted into evidence and published to the jury.

When questioned about the lineup identification that she also did that day, Ms. Pulliam stated she picked the person "that looked the closest" but she "wasn't a hundred percent [sure][.]" She further testified that she initialed the photograph of defendant in the lineup "because that resembled who it was and it turned out to be the same guy . . . sitting [in the courtroom] [that day]." When asked whether she saw the person in the courtroom that was shooting on 25 June 2017, Ms. Pulliam stated "correct[,]" and when asked to identify that person, she identified defendant. Ms.

Pulliam also testified she did not see or hear Mr. Shields do anything to provoke defendant.

On cross, Ms. Pulliam denied telling defense counsel and his investigator that she could not identify defendant and stated the shooter did not have anything obstructing their face. When defense counsel showed Ms. Pulliam the video again and asked whether it appeared the shooter had on a mask, she admitted it did, "[f]rom that angle[.]" Furthermore, Ms. Pulliam acknowledged that during her interview she told detectives she grabbed the shooter, even though the video did not show that, but stated she "thought that [she] grabbed him because that's what [she] intended to do was [to] try to stop the situation." Lastly, Ms. Pulliam testified that she "thought [defendant] was arguing with his sister[,] [Trina,] again."

Next, the State called Ms. Skyes to the stand. Although Ms. Skyes testified she recalled being at the Pisgah View Apartments on 25 June 2017 with Ms. Pulliam and her friend Nadia, Ms. Skyes stated she did not "remember nothing [sic] from that day at all[,]" and denied Trina was there. Ms. Skyes further testified that she did not remember her interview with detectives on 27 June 2017 and stated three times that reading the transcript of the interview would not refresh her recollection. Ms. Skyes did, however, remember doing the photo lineup and picking out a picture of defendant, her cousin, but stated she did not think she was picking out the perpetrator. Furthermore, she testified she did not recall telling Detective Morgan she was very confident the person she identified in the lineup was the perpetrator.

Although Ms. Skyes stated she did recall going to the APD, she did not remember the substance of the interview. Ms. Skyes testified she "told [detectives] the truth if [she] talked to them[,]" but then later stated she did not remember if she told detectives the truth. At this point, the State moved to "admit [Ms. Skyes] recorded interview as a recorded recollection since she ha[d] insufficient knowledge to testify about [the interview.]" Outside the presence of the jury, the defense vehemently objected to the admission of the video, arguing the exception did not apply in this situation, the video would present a Constitutional confrontation issue, and under Rule 403, the probative value of the video interview was substantially outweighed by unfair prejudice.

The trial court, based on "the totality of the circumstances[,]" found the State satisfied the requirements of Rule 803(5) and the recorded interview could be played for the jury, but the transcript of the interview could not be admitted. Ms. Skyes was recalled to the stand and the recorded interview was played for the jury over defense counsel's objection.

After the video was played, Ms. Skyes testified that it did not refresh her recollection of her interview. Ms. Skyes did, however, acknowledge her signature on the photo lineup identification, but did not remember the other pictures in the lineup. The photo lineup identification where Ms. Skyes identified defendant as the shooter on 27 June 2017 was admitted into evidence over defense's objection.

During cross-examination, when asked whether the shooter had on a mask,

Ms. Skyes testified they did, but then stated she thought so, but she did not remember. This was the first time Ms. Skyes ever mentioned the shooter wearing a mask. Furthermore, when asked if she continuously testified she could not remember anything because she "knew at the time [of the interview]" she could not ID the shooter because she "couldn't really see that person's face[,]" Ms. Skyes replied in the affirmative, and stated she was "just scared and ready to get out of the room."

The detectives who conducted the interviews of Ms. Skyes and Ms. Pulliam also testified for the State. Detective Crowe testified that Ms. Skyes was not forthcoming and "standoffish" at the beginning of the interview, but once her demeanor and story changed, she did not waver in her narrative and was unequivocal about the person they were discussing. Detective Morgan testified that Ms. Pulliam was cooperative and forthcoming in her interview, but that she "appeared much more reluctant to testify . . . in court[.]" Detective Morgan also testified that as part of the investigation, detectives identified a Facebook page belonging to defendant under the name "KaPo Bop." The "profile image" on the account was a photograph of defendant, and on 5 May 2017 a photograph of defendant with Ms. Fair was uploaded to his Facebook account.

Sarah Ellis ("Ms. Ellis"), a forensic scientist with the North Carolina State Crime Lab, testified as to the DNA results from the Chevrolet Impala. Ms. Ellis tested "a swab from [the] driver's side front door interior of [the] Chevy Impala, a swab from [the] driver['s] side rear door interior of the same vehicle, a swab from [the]

passenger side rear interior, and a swab from the passenger side front door interior" for DNA. Although most of the swabs produced DNA profiles that "were inconclusive due to complexity and/or insufficient quality of DNA recovered[,]" the swab from the rear passenger side interior produced a DNA profile that was a mixture of three contributors. Defendant and Mr. Shields were excluded as contributors to the major DNA profile, but the minor profile "was inconclusive due to complexity and/or insufficient quality of DNA."

The State also introduced, over defense's objection, three of defendant's recorded jail calls, from 11 November 2017 and 12 November 2017. In the calls, defendant discussed "Hog," inquired about how law enforcement got the Motel 6 room number, and stated he "ain't gonna [sic] run no more." Lastly, Chad Case ("Mr. Case") testified for the State. Mr. Case testified that on 6 November 2017, while he was at the BP on Tunnel Road, "[a] guy and a girl" approached him and offered him money to rent a room for them at the Motel 6 using his ID. Mr. Case booked the room in exchange for thirty dollars.

Defendant made a motion to dismiss at the close of the State's evidence, and at the close of all evidence, arguing the State presented insufficient evidence. Both motions were denied. Defendant did not present any evidence.

At the charge conference, defense counsel requested an instruction on the lesser-included offenses of involuntary manslaughter and second-degree murder. Defense counsel argued Ms. Skyes's statements in her interview that defendant

"didn't want to shoot [Mr. Shields][,]" but someone was "in his ear . . . telling him to[,]" and that "witnesses [at the shooting] were egging him on," along with the fact that Mr. Shields was "having some kind of relationship with [defendant's] sister" all "warrant[ed] an instruction on manslaughter because that's classic heat of passion[.]" Defense counsel also requested a special instruction "on intent, premeditation and deliberation for adolescents[.]" The trial court declined to provide either instruction.

As part of the State's closing, they utilized a PowerPoint presentation of the evidence presented, including wording from Ms. Skyes's recorded interview. The defense objected, arguing the wording was "verbatim wording from the transcript that [the court] rule[d] was not to be admitted as an exhibit" and moved for a mistrial. The trial court found this was not the transcript, but a tool created by the State, and once brought to the court's attention the State was instructed to "take [it] down[,]" and a curative instruction was provided. Defendant's motion for a mistrial was denied.

On 22 June 2017, the jury found defendant guilty of first-degree murder and a sentencing hearing was set for 24 June 2021. Prior to the sentencing hearing, the State and defendant's counsel stipulated to several mitigating factors, including defendant's age at the time of the offense. Following the sentencing hearing, defendant was sentenced to life imprisonment with the possibility of parole. Defendant gave oral notice of appeal in open court.

## II.   Discussion

On appeal, defendant raises six issues. Specifically, defendant argues the trial court erred by: (1) failing to instruct the jury on second-degree murder; (2) failing to give the instruction on intent, premeditation, and deliberation for adolescents; (3) admitting the recorded interview with Ms. Skyes and her identification of defendant as the shooter; (4) admitting Ms. Pulliam's identification of defendant as the shooter when detectives used "impermissibly suggestive" interview tactics; and (5) permitting detectives to testify Ms. Pulliam and Ms. Skyes were "forthcoming and unequivocal when they identified" defendant as the shooter because this invaded the province of the jury. Defendant further argues that the "cumulative prejudice from the trial court's errors" entitle him to a new trial. We address each of defendant's arguments in turn.

## A. Second-Degree Murder Jury Instruction

First, defendant argues the trial court erred by failing to instruct the jury on the lesser-included offense of second-degree murder. Specifically, defendant contends the jury could have found defendant did not act with premeditation and deliberation since defendant was sixteen at the time, there was evidence defendant "react[ed] impulsively to the repeated provocation from [Ms.] Fair[,]" defendant had learned of Mr. Shield's relationship with his underage sister, and defendant "smoked marijuana on the day of the shooting." We disagree.

As an initial matter, we address two issues defendant raised in his brief. First, we note that although defendant claims he used marijuana "earlier on the day of the

shooting[,]" voluntary intoxication can only "negate the evidence of . . . specific intent if it is shown that the defendant was so intoxicated *at the time he committed the crime* that he was utterly unable to form the necessary specific intent." *State v. Williams*, 308 N.C. 47, 71, 301 S.E.2d 335, 350 (emphasis added) (citations omitted), *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). "Evidence of mere intoxication, however, is not enough[.]" *State v. Williams*, 343 N.C. 345, 365, 471 S.E.2d 379, 390 (1996), *cert. denied*, 519 U.S. 1061, 136 L. Ed. 2d 618, *reh'g denied*, 519 U.S. 1156, 137 L. Ed. 2d 231 (1997). Furthermore, voluntary intoxication is an affirmative defense, so evidence of "intoxication to a degree sufficient to negate *mens rea*" is the burden of defendant. *State v. Chapman*, 359 N.C. 328, 378, 611 S.E.2d 794, 830 (2005) (citation omitted). Here, no evidence of such intoxication was presented to the jury, nor does defendant make any argument that he was so intoxicated that he could not form intent.

Furthermore, although age may be a "factor" in the *Miranda* analysis, *J.D.B. v. North Carolina*, 564 U.S. 261, 277, 180 L. Ed. 2d 310, 326-27 (2011), and in sentencing, *Roper v. Simmons*, 543 U.S. 551, 568, 161 L. Ed. 2d 1, 21 (2005); *Thompson v. Oklahoma*, 487 U.S. 815, 838, 101 L. Ed. 2d 702, 720 (1988), defendant has presented no case law that his age alone negates any element of first-degree murder. Accordingly, we need not consider these issues, and instead address whether defendant was entitled to an instruction based on his other arguments.

Since this alleged error was preserved for appeal, we review the trial court's

decision *de novo*. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009) (citations omitted) ("Assignments of error challenging the trial court's decisions regarding jury instructions are reviewed *de novo*, by this Court."). "An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002) (citation omitted).

> If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree . . . and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Sterling*, 233 N.C. App. 730, 732-33, 758 S.E.2d 884, 886 (citation omitted), *disc. review denied and appeal dismissed*, 367 N.C. 523, 763 S.E.2d 142 (Mem) (2014).

"The substantive elements of first-degree murder are:  (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." *State v. Guin*, 282 N.C. App. 160, 166, 870 S.E.2d 285, 290 (citation, internal quotation marks, and brackets omitted), *disc. review denied*, 876 S.E.2d 281 (Mem) (2022).  By contrast, the elements of second-degree murder are:  "(1) [the] unlawful killing (2) of a human being (3) with malice, but without premeditation and deliberation." *State v. Vassey*, 154 N.C. App. 384, 390, 572 S.E.2d 248, 252 (2002) (citation omitted), *disc. review denied*, 356 N.C. 692, 579 S.E.2d 96 (Mem), *and cert.*

*denied*, 357 N.C. 469, 587 S.E.2d 339 (Mem) (2003).

Premeditation is a "thought beforehand for some length of time, however short." *State v. Horskins*, 228 N.C. App. 217, 221, 743 S.E.2d 704, 708 (citation omitted), *disc. review denied*, 367 N.C. 273, 752 S.E.2d 481 (Mem) (2013). However, murder is "committed with deliberation if it is done in a 'cool state of blood,' without legal provocation, and in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose." *Id.* at 221, 743 S.E.2d at 708 (citation omitted).

> "Cool state of blood" does not mean the absence of passion and emotion, but an unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time *unless such anger or emotion was such as to disturb the faculties and reason.*

*Id.* at 221-22, 743 S.E.2d at 708-709 (emphasis added) (citation omitted).

"[P]remeditation and deliberation are not usually susceptible of direct proof and are therefore, susceptible of proof by circumstances from which the facts sought to be proven may be inferred." *State v. Faust*, 254 N.C. 101, 107, 118 S.E.2d 769, 772-73 (citations and quotation marks omitted), *cert. denied*, 368 U.S. 851, 7 L. Ed. 2d 49 (1961). Factors relevant to the determination of whether the defendant acted with premeditation and deliberation include:

> Want of provocation on the part of deceased. The conduct of defendant before and after the killing. Threats and declarations of defendant before and during the course of the occurrence giving rise to the death of deceased. The

> dealing of lethal blows after deceased has been felled and
> rendered helpless.

*Id.* at 107, 118 S.E.2d at 773 (citations omitted). "Additional factors include the nature and number of the victim's wounds, whether the defendant left the deceased to die without attempting to obtain assistance for the deceased, whether he disposed of the murder weapon, and whether the defendant later lied about what happened." *Horskins*, 228 N.C. App. at 222, 743 S.E.2d at 709 (citing *State v. Hunt*, 330 N.C. 425, 428-29, 410 S.E.2d 478, 481 (1991) (citations and quotation marks omitted)). "Premeditation and deliberation may [also] be inferred from the multiple shots fired by defendant." *Chapman*, 359 N.C. at 376, 611 S.E.2d at 828 (citations omitted).

Here, the State satisfied its burden of proving every element of the offense of first-degree murder and, despite defendant's argument, there was no evidence to negate any element, therefore the trial court did not err by declining to instruct the jury on second-degree murder. *See Sterling*, 233 N.C. App. at 733, 758 S.E.2d at 886; *see also State v. Leazer*, 353 N.C. 234, 240, 539 S.E.2d 922, 926 (2000) (citation omitted) ("Because there was positive, uncontradicted evidence of each element of first-degree murder, an instruction on second-degree murder was not required."). " 'A defendant is not entitled to an instruction on a lesser included offense merely because the jury could possibly believe some of the [S]tate's evidence but not all of it.' " *Leazer,* 353 N.C. at 240, 539 S.E.2d at 926 (citation omitted). Furthermore " 'mere speculation [as to the rationales for defendant's behavior] is not sufficient to negate

evidence of premeditation and deliberation.' " *Id. (*alterations in original) (citation omitted). Here, the evidence teneded to show defendant arrived at the scene armend, fired multiple times as Ms. Shields' back was turned and he was attempting to flee, Mr. Shields did not provoke defendant at the time of the shooting, and defendant fled the scene leaving Mr. Shields to die.

Still, defendant argues a second-degree murder instruction was warranted since the jury could have found he acted without premeditation and deliberation because he had, at some indeterminate time earlier in the day, told Ms. Skyes he was only going to fight Mr. Shields, because he acted after being provoked and bullied by Ms. Fair, and because he "was angry at Mr. Shields for having sex with his younger sister[.]"

Defendant's argument regarding Ms. Fair is not supported by a review of the law related to provocation. Our case law recognizes evidence of provocation by the *deceased* may be considered in the deliberation analysis, but provocation by a third-party is not. *State v. Elliott*, 344 N.C. 242, 271, 475 S.E.2d 202, 214 (1996) (emphasis added) (finding the trial court did not err by narrowing the scope to lack of provocation "by the deceased" since the instruction was based on pattern jury instructions and consistent with case law), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). This concept is consistent with our Supreme Court's established holding that duress and coercion are not valid defenses to first-degree murder, as the influence of a third person cannot excuse murder in the first-degree. *State v. Dowell*, 106 N.C. 722, 11

S.E. 525, 526 (1890) (" 'And, therefore, though a man may be violently assaulted, and hath no other possible means of escaping death but by killing an innocent person, this fear and force shall not acquit him of murder; for he ought rather to die himself than escape by the murder of an innocent.' "); *State v. Cheek*, 351 N.C. 48, 61, 520 S.E.2d 545, 553 (1999), *cert. denied*, 530 U.S. 1245, 147 L. Ed. 2d 965 (2000).

Defendant's second argument, that Ms. Skyes's interview showed he was "angry" at Mr. Shields but agreed he was only going to fight the victim, is likewise without merit. Our case law holds that deliberation occurs in a "cool state of blood" if done in furtherance of revenge, even if defendant is angry at the time of the killing, as long as defendant's emotions are not "such as to disturb the faculties and reason." *Horskins*, 228 N.C. App. at 221-22, 743 S.E.2d at 708-709. Defendant presented no evidence his anger amounted to such a level. *See State v. Bedford*, 208 N.C. App. 414, 419, 702 S.E.2d 522, 528 (2010).

In fact, the interview with Ms. Skyes which defendant relies upon does not help this argument but hinders it. Ms. Skyes stated in the interview she had "talked [defendant] out of it and [she] had calmed him down earlier that day" and told defendant to "fight" Mr. Shields, but not shoot him, and defendant agreed. This statement is not sufficient to negate the element of premeditation and deliberation and to warrant an instruction of second-degree murder. Even if in some moment earlier in that day defendant did not have the intent to kill Mr. Shields, this is not a reflection of his state of mind and intent at the time of the shooting, as premeditation

only requires some "thought beforehand . . . however short." *Horskins*, 228 N.C. App. at 221-22, 743 S.E.2d at 708. This argument is particularly unpersuasive when, later that day, defendant arrived at the crime scene with a gun and proceeded to fire five shots at the victim with the fatal shot striking him in the back as he ran away. Accordingly, we hold the trial court did not err by declining to provide defendant's requested instruction for second-degree murder.

## B.    Special Jury Instruction

Next, defendant argues the trial court erred in failing to provide his requested special instruction on intent, premeditation, and deliberation for adolescents. Specifically, defendant contends this "novel" instruction "would have enabled the jury to determine . . . whether [defendant] had the necessary *mens rea* for first-degree murder[,]" and defendant was prejudiced by the by the trial court's failure to provide the instruction. We disagree.

"A trial court should give a specific jury instruction when '(1) the requested instruction [i]s a correct statement of law and (2) [i]s supported by the evidence, and . . . (3) the [pattern jury] instruction . . ., considered in its entirety, fail[s] to encompass the substance of the law requested and (4) such failure likely misle[ads] the jury.'" *State v. Steele*, 281 N.C. App. 472, 482, 868 S.E.2d 876, 884 (alterations in original) (citation omitted), *disc. review denied*, 878 S.E.2d 809 (Mem) (2022). "Failure to give a requested and appropriate jury instruction is reversible error if the requesting party is prejudiced as a result of the omission." *State v. Guerrero*, 279

N.C. App. 236, 241, 864 S.E.2d 793, 798 (citation and internal quotation marks omitted). "[W]here the request for a specific instruction raises a question of law, 'the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court.'" *State v. Edwards*, 239 N.C. App. 391, 393, 768 S.E.2d 619, 621 (2015) (citation omitted).

Here, defendant requested an instruction which stated, in pertinent part:

> In this case, you may examine the defendant's actions and words, and all of the circumstances surrounding the offense, to determine what the defendant's state of mind was at the time of the offense. However, the law recognizes that juveniles are not the same as adults. An adult is presumed to be in full possession of his senses and knowledgeable of the consequences of his actions. By contrast, the brains of adolescents are not fully developed in the areas that control impulses, foresee consequences, and temper emotions. Additionally, adolescents often lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them.
>
> You should consider all the circumstances in the case, any reasonable inference you draw from the evidence, and differences between the way that adult and adolescent brains functions in determining whether the State has proved beyond a reasonable doubt that defendant intentionally killed the victim after premeditation and deliberation.

The trial court refused to provide this instruction, stating no evidence of adolescent brain development had been presented and although case law made a distinction between adults and juveniles for sentencing purposes, this was not an appropriate determination for the jury.

Although we agree the Supreme Court of the United States has stated "children are constitutionally different from adults for purposes of *sentencing*[,]" it has never found this difference relevant to a finding of guilt. *Miller v. Alabama*, 567 U.S. 460, 471, 183 L. Ed. 2d 407, 418 (2012) (emphasis added). In fact, the Supreme Court has articulated their decisions do not "suggest an absence of legal responsibility where crime is committed by a minor." *Eddings v. Oklahoma*, 455 U.S. 104, 116, 71 L. Ed. 2d 1, 12 (1982). Defendant concedes that no court has held such and we decline to announce a new legal precedent.

Here, even if the statements in defendant's proposed instructions are, arguably supported by current scientific research, they are not supported by the evidence, since no evidence was presented on adolescent brain function, and they are not a correct statement of the law. The instruction for first-degree murder provided by the trial court fully encompassed the elements of the offense. *Guin*, 282 N.C. App. at 166, 870 S.E.2d at 290; *see Steele*, 281 N.C. App. at 482, 868 S.E.2d at 884. Defendant's age is not considered nor contemplated in the analysis of premeditation and deliberation, therefore, this instruction would be incorrect and likely to mislead the jury. *Guin*, 282 N.C. App. at 166, 870 S.E.2d at 290; *see State v. Palmer*, 273 N.C. App. 169, 173, 847 S.E.2d 449, 452 (2020) (finding "[t]he trial court did not err in denying [d]efendant's request for a special jury instruction on lawful possession of a controlled substance where the requested instruction improperly characterized an exception as an element"); *see also Steele,* 281 N.C. App. at 483, 868 S.E.2d at 884. Accordingly,

the trial court did not err.

## C.     Ms. Skyes's Interview and Identification

Defendant next contends the trial court erred by playing the video of Ms. Skyes's 27 June 2017 interview and introducing her photo lineup identification of defendant because both were inadmissible hearsay and violated Rule 403.  We note that this is the evidence that defendant extensively relies upon in his argument for the instruction on second-degree murder addressed above.  This argument is without merit.

## 1.     Hearsay Exception

"The admission of evidence alleged to be hearsay is reviewed *de novo* when preserved by an objection."  *State v. Harris*, 253 N.C. App. 322, 327, 800 S.E.2d 676, 680 (citation omitted), *disc. review denied*, 370 N.C. 70, 803 S.E.2d 388 (Mem) (2017). "Evidentiary errors are harmless unless a defendant proves that absent the error a different result would have been reached at trial."  *State v. Ferguson*, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893 (citation omitted), *disc. review denied*, 354 N.C. 223, 554 S.E.2d 650 (Mem) (2001).

"Evidence of an out-of-court statement of a witness . . . may be offered as substantive evidence" if the evidence is "offered for the truth of the matter asserted and qualifie[s] as an exception under [North Carolina] hearsay rules."  *State v. Ford*, 136 N.C. App. 634, 640, n. 1, 525 S.E.2d 218, 222, n.1 (2000).  "Evidence which falls within a 'firmly rooted' hearsay exception is sufficiently reliable to prevent violation

of a defendant's right to confrontation."  *State v. Valentine*, 357 N.C. 512, 520, 591

S.E.2d 846, 854 (2003) (citations omitted); *State v. Leggett*, 135 N.C. App. 168, 175,

519 S.E.2d 328, 333 (1999) (finding Rule 803(5) is firmly rooted in North Carolina),

*disc. review denied and appeal dismissed*, 351 N.C. 365, 542 S.E.2d 650 (Mem) (2000).

Hearsay is defined as "a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted."  N.C. Gen. Stat. § 8C-1, Rule 801(c) (2022).  Although "hearsay is not

admissible[,]" our statutes provide exceptions to this general rule.  *Id.* § 8C-1, Rules

802-803 (2022). One such exception is for recorded recollections.  The relevant statute

allows for the admission of such evidence if it meets the following criteria:

> A memorandum or record concerning a matter about which
> a witness once had knowledge but now has insufficient
> recollection to enable him to testify fully and accurately,
> shown to have been made or adopted by the witness when
> the matter was fresh in his memory and to reflect that
> knowledge correctly.  If admitted, the memorandum or
> record may be read into evidence but may not itself be
> received as an exhibit unless offered by an adverse party.

*Id.* § 8C-1, Rule 803(5) ("the Rule").  "While the Rule speaks of a 'memorandum or

record,' the word record is broadly construed to include both audio and video

recordings."  *State v. Thomas*, 281 N.C. App. 159, 166, 867 S.E.2d 377, 385 (2021)

(citations omitted), *disc. review denied*, 878 S.E.2d 808 (Mem) (2022).

Before hearsay can be admitted under this exception, the party offering the

evidence must show:  (1) the evidence "pertain[s] to matters about which the

declarant once had knowledge;" (2) the declarant does not now have sufficient recollection of the matters; and (3) the evidence was made by declarant, or if made by someone other than declarant, was "examined and adopted . . . when the matters were fresh in [declarant's] memory[,]" and "reflect[ed] [declarant's] knowledge correctly." *State v. Love*, 156 N.C. App. 309, 314, 576 S.E.2d 709, 712 (2003) (citation omitted); *State v. Brown*, 258 N.C. App. 58, 68, 811 S.E.2d 224, 230-31, *disc. review denied*, 371 N.C. 340, 813 S.E.2d 853 (Mem) (2018). However, "the mere fact a statement is recorded is not enough to meet the requirement the statements contained therein reflected the witness's knowledge accurately at the time." *Thomas*, 281 N.C. App. at 167, 867 S.E.2d at 386 (citation omitted).

Here, defendant takes issue with two criteria: (1) "Ms. Skyes did not testify" that the matters were fresh in her mind when she participated in the interview and photo lineup; and (2) the interview and lineup did not correctly reflect her knowledge of the shooting. As to defendant's first issue, the trial court concluded Ms. Skyes's statement was made "only two days" after the shooting, and thus was made "while her memory of those events were still fresh[.]" Ms. Skyes's testimony to such a fact was not required, and the trial court can conclude from the fact that the interview occurred two days after the shooting that the matter was fresh in her memory at the time. *State v. Nickerson*, 320 N.C. 603, 608, 359 S.E.2d 760, 762 (1987) (finding the trial court "could properly conclude" the witness's statement, "made approximately five weeks after the incident[,]" was fresh in the witness's memory at the time the

statement was made despite the defendant's contention that this was not shown).

Next, we consider whether the interview and lineup correctly reflect Ms. Skyes's knowledge of the event.

> The caselaw on whether the record correctly reflected the witness's knowledge at the time involves the far sides of the spectrum. On the one end, this Court has ruled the record did not correctly reflect the witness's knowledge at the time where the witness disagreed with or disavowed their prior statements on the stand.

*Thomas*, 281 N.C. App. at 167, 867 S.E.2d at 386 (citations omitted). However, "this Court has ruled that the record accurately reflected the witness's knowledge at the time when the person testified they recorded all the information they had at the time." *Id.* at 168, 867 S.E.2d at 386. In cases where the witness "did not testify the statements were correct at the time, but [they] likewise did not disavow the statements on the stand[,]" unless the witness makes "any direct statements indicating she was lying," the court can find the witness relayed information that correctly represented their knowledge. *Id.* (finding the witness's testimony that she was "laying it all out" in her previous statement and no direct statement she was lying were enough for the court to properly conclude the hearsay statement correctly reflected her knowledge). Furthermore, "[t]his Court previously considered signing and dating a statement . . . to support a finding that the written statement correctly reflected the witness's prior knowledge." *Id.* at 169, 867 S.E.2d at 387.

Here, Ms. Skyes testified that she remembered being at the Pisgah View

Apartments on 25 June 2017, she identified herself as the person in the red shirt in the surveillance footage, and she stated she did recall participating in a photo lineup and identified her signature and initials on the lineup packet. Ms. Skyes testified she picked out the photograph of defendant because detectives asked her to pick out "Bop[,]" but she did not think she was identifying the perpetrator. Furthermore, Ms. Skyes testified she did recall going to APD and speaking with detectives on 27 June, but repeatedly testified she did not remember the substance of the interview. Ms. Skyes also refused to review the transcript of the interview to refresh her recollection. When asked whether she told detectives the truth that day, she testified, "[y]es, I hope so. I don't remember nothing [sic] from that day. I told them the truth if I talked to them." However, later on direct examination when asked whether she told detectives the truth during her interview, Ms. Skyes stated she "didn't remember nothing [sic] from four years ago[.]"

We find no error in the trial court's decision. Although Ms. Skyes did not testify her statements to detectives in the interview were correct, she did not disavow her statements before the trial court made its decision, and at one point testified she told law enforcement the truth if she spoke to them. *See Thomas*, 281 N.C. App. at 167, 867 S.E.2d at 386. Furthermore, Ms. Skyes identified her signature and initials on the pre-trial identification paperwork, and acknowledged she picked out defendant, even though she claimed she did not think she was picking out the perpetrator. Accordingly, we find the interview and photo lineup were properly admitted.

Defendant further argues the trial court erred in admitting the video and playing it for the jury because it "violated" the rule "proscription" which states that if admissible, the evidence can be read into the evidence but not offered as an exhibit unless offered by the other party. Defendant acknowledges that video evidence is a "record" under the exception and does not provide any legal basis for this contention. Nor does defendant provide any basis for their contention that the State's PowerPoint slides containing quotes from the interview, which were taken down and a corrective instruction given, violated the Rule. Accordingly, this argument is likewise without merit.

## 2. Rule 403

Lastly, defendant contends the lineup and the interview, even if admissible, violated North Carolina Rule of Evidence 403 ("Rule 403"). "Rulings under [Rule 403] are discretionary, and a trial court's decision on motions made pursuant to Rule 403 are binding on appeal, unless the dissatisfied party shows that the trial court abused its discretion." *Chapman*, 359 N.C. at 348, 611 S.E.2d at 811 (citations omitted). "A trial court will not be reversed for an abuse of discretion absent 'a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 46, 530 S.E.2d 281, 288 (2000) (citations omitted), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001).

Under Rule 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2022). "Unfair prejudice . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." *State v. Wilkerson*, 363 N.C. 382, 418, 683 S.E.2d 174, 196 (2009) (citation and internal quotation marks omitted), *cert. denied*, 559 U.S. 1074, 176 L. Ed. 2d 734 (2010).

Here, the trial court did not abuse its discretion in admitting the interview over defense's Rule 403 objection since it was highly probative of defendant's motive. Although the State is not required to prove motive for a first-degree murder, "[t]he existence of a motive is . . . a circumstance tending to make it more probable that the person in question did the act, hence evidence of motive is always admissible where the doing of the act is in dispute." *State v. Coffey*, 326 N.C. 268, 280, 389 S.E.2d 48, 55 (1990) (citations and internal quotation marks omitted). Considering the high probative value of the interview and the information it contained about defendant's issue with Mr. Shields, we do not think it is substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion.

### D. Ms. Pulliam's Identification

Defendant next argues the trial court erred by admitting Ms. Pulliam's in-court and photo lineup identification of defendant "because the procedures used by investigators to obtain the identification were so impermissibly suggestive that there was a substantial likelihood of irreparable misidentification."

As an initial matter, defendant makes several references to the recorded interview of Ms. Pulliam, which was not shown to the jury. Although it was admitted during the pre-trial motion to suppress hearing, defendant does not argue on appeal the trial court incorrectly denied this motion. Accordingly, we do not consider the video and limit our review to the evidence presented at trial.

"Identification evidence must be suppressed on due process grounds where the facts show that the pretrial identification procedure was so suggestive as to create a very substantial likelihood of irreparable misidentification." *State v. Wilson*, 313 N.C. 516, 528-29, 330 S.E.2d 450, 459 (1985) (citations omitted). This analysis requires a two-step determination. "First[,] we must determine whether an impermissibly suggestive procedure was used in obtaining the out-of-court identification." *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984) (citations omitted). If not, we need not proceed with the analysis. *Id.* (citation omitted). However, "[i]f it is answered affirmatively, the second inquiry is whether, under all the circumstances, the suggestive procedures employed gave rise to a substantial likelihood of irreparable misidentification." *Id.* (citation omitted). To determine whether the procedures are impermissibly suggestive, the court must examine "the totality of the circumstances" to determine whether the procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." *Id.* (citation omitted).

In his brief, defendant did not make any arguments as to why the procedures

detectives used were unnecessarily suggestive or conducive to misidentification. Rather, defendant's argument is based on the second step of the analysis. Accordingly, we find defendant's argument, based solely on the second prong of the test without meeting the first hurdle, is without merit. Nevertheless, we address defendant's argument as to the second step of the analysis.

> The factors to be considered in evaluating the likelihood of irreparable misidentification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*State v. Grimes*, 309 N.C. 606, 609-10, 308 S.E.2d 293, 294-95 (1983) (citation omitted).

Based on the totality of the circumstances, we find no error in the admission of Ms. Pulliam's identification of defendant. She saw him during the shooting in the daytime, she testified she got "a glimpse" of the shooter's face and that she had "seen him previously in the" apartment complex and recognized him as "Bop," and she stated he did not have anything obstructing his face. Ms. Pulliam participated in the lineup less than six hours after the shooting, and in her identification packet that she signed, she was "100%" sure defendant was the perpetrator. Even if she faltered on the stand, her credibility and the weight given to her identification of defendant was for the jury. *Hannah*, 312 N.C. at 293, 322 S.E.2d at 153 (citation omitted) ("[T]he

credibility of the witness and the weight to be given his identification testimony is for the jury to decide.").

"Since we find the pretrial identification procedures free of the taint of impermissible suggestiveness, we hold the trial court properly admitted the in-court identification of defendant by [Ms. Pulliam]." *Id.* at 294, 322 S.E.2d at 153. Accordingly, this argument is without merit.

### E. Detectives' Statements

Defendant also contends the trial court plainly erred by allowing detectives to testify Ms. Skyes and Ms. Pulliam were "forthcoming" and "unequivocal" when they identified defendant as the shooter, because such statements invaded the province of the jury as they were improper lay opinions under Rule 701. Defendant argues "credibility determinations" are for the jury to decide, and thus the detectives should not have been allowed to "bolster [the witnesses'] identifications[.]" This argument is likewise without merit.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. 10(a)(1) (2023). However, "[i]n criminal cases, an issue that was not preserved by objection . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P.

10(a)(4). Because defendant did not preserve any errors related to the testimony in question, this Court's review is limited to whether the trial court's actions constituted plain error.

Our Supreme Court has stated:

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (alteration in original) (citations and quotation marks omitted). "Plain error includes error that is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done; or grave error that amounts to a denial of a fundamental right of the accused; or error that has resulted in a miscarriage of justice or in the denial to appellant of a fair trial." *State v. Gregory*, 342 N.C. 580, 586, 467 S.E.2d 28, 32 (1996) (citation omitted).

Under Rule 701, a lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2022). This

Court has found that law enforcement's testimony concerning a witness's "demeanor does not constitute an opinion as to the credibility of [the witness] that is subject to Rule 701." *State v. Orellana*, 260 N.C. App. 110, 116, 817 S.E.2d 480, 485 (2018) (citing *State v. Gobal*, 186 N.C. App. 308, 317, 651 S.E.2d 279, 285 (2007), *aff'd*, 362 N.C. 342, 661 S.E.2d 732 (Mem) (2008)). Therefore, detectives' testimony that the witnesses were "standoffish" or "forthcoming" was admissible.

Furthermore, we do not believe detectives' testimony that Ms. Skyes did not waver in her narrative during her interview and was unequivocal about the person they were discussing once she changed her story is a comment on her credibility. This observation is based on his perception of the interview and is helpful considering the difference between her initial statement that she did not know the shooter and her later statement during her interview. *See State v. Dickens*, 346 N.C. 26, 46, 484 S.E.2d 553, 564 (1997) (finding the detective's opinion about the witness's "demeanor was based on his personal observations" and "was helpful to a clear understanding of his testimony concerning the differences between" the witness's first and second statement).

We do not believe the testimony by detectives were improper statements as to Ms. Skyes's credibility, as "[t]he cases in which this Court and [our] Supreme Court have reversed convictions based upon [a witness vouching for the credibility of another witness] generally involve testimony that directly comments on the credibility of the" witness. *State v. Dew*, 225 N.C. App. 750, 762, 738 S.E.2d 215, 223,

*disc. review denied*, 366 N.C. 595, 743 S.E.2d 187 (Mem) (2013). Here, detectives did not directly comment on whether Ms. Skyes was telling the truth. *Gobal*, 186 N.C. App. at 318-19, 651 S.E.2d at 286 (finding detective's testimony that it was his "impression" the witness "told [him] the truth" was improper testimony as to the witness's credibility).

Even assuming *arguendo* that the statements were admitted in error, given the video of defendant shooting the victim in the back as he attempted to run away, and Ms. Pulliam's and Ms. Skyes's identifications of defendant as the perpetrator, such statements cannot rise to the level of plain error. Accordingly, this argument is without merit.

## F.    Cumulative Prejudice

Lastly, defendant argues the "cumulative effect of the preserved errors" requires this Court to grant defendant a new trial. As we have found no errors, we find no merit in this contention. *See State v. Beane*, 146 N.C. App. 220, 234, 552 S.E.2d 193, 202 (2001), *appeal dismissed*, 355 N.C. 350, 563 S.E.2d 562 (Mem) (2002).

## III.    Conclusion

For the foregoing reasons, we hold defendant received a fair trial free from prejudicial error.

NO ERROR.

Judge DILLON concurs.

Judge MURPHY concurs in Parts II-A through II-D and concurs in

result only in Parts II-E and II-F.